LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Adam J. Goldberg
Marc A. Zelina

355 South Grand Avenue
Los Angeles, CA 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Adam E. Malatesta (admission *pro hac vice,* pending)

Attorneys for Johan Bastin
as Petitioner and Foreign Representative

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| DTEK Finance plc, | ) | Case No. _____ (___) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |

## VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING, SUPPLEMENTING "VOLUNTARY PETITION" [DOCKET NO. 1], AND MOTION FOR RELATED RELIEF PURSUANT TO SECTIONS 105(A), 1507(A), 1509(B)(2)-(3), 1521(A), AND 1525(A) OF THE BANKRUPTCY CODE GIVING FULL FORCE AND EFFECT TO UK SCHEME OF ARRANGEMENT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................2

BACKGROUND ...................................................................................................5

    A.    The Debtor and Its Corporate Group Structure........................................5

    B.    The Business and History of the Debtor and the Group .........................6

        (i)    Coal Mining ................................................................6

        (ii)    Power Generation........................................................7

        (iii)    Electricity Distribution................................................8

    C.    Summary of the Debtor's and Group's Capital Structure........................9

    D.    The Foreign Representative ...................................................11

    E.    Events Preceding the Commencement of the UK Proceeding.............................12

        (i)    Geopolitical and Economic Situation in Ukraine ......................12

        (ii)    The Debtor's Liquidity Constraints .........................................18

        (iii)    Long-Term Restructuring Efforts .............................................19

    F.    The Debtor's Connections with the United Kingdom ..........................21

    G.    Commencement of the UK Proceeding and Activity to Date................................23

    H.    Terms of the Restructuring under the Scheme.......................................26

    I.    DTEK's Connections to the United States and the Need for Timely
        Chapter 15 Relief ....................................................28

JURISDICTION AND VENUE .................................................................30

RELIEF REQUESTED.............................................................................31

BASES FOR RELIEF...............................................................................34

    A.    The Court Should Grant Recognition of the UK Proceeding as a Foreign
        Main Proceeding and of the Petitioner as its Foreign Representative ..................35

        (i)    The UK Proceeding is a Foreign Main Proceeding ...................36

i

(ii)     The Petitioner Meets the Requirements of a Foreign Representative........42

(iii)    The Petition Meets the Requirements of Section 1515...........................43

B.    The Debtor Is Entitled to the Automatic Relief Under 11 U.S.C. § 1520 ............44

C.    The Discretionary Relief Requested Is Necessary and Appropriate to Effect the Restructuring and Should Be Granted....................................................45

(i)     The Discretionary Relief Requested Is Appropriate under Section 1521........................................................................................................47

(ii)    The Discretionary Relief Requested Meets the Standards for Injunctive Relief.........................................................................................48

(iii)   Granting the Discretionary Relief Requested Will Leave Creditors and Other Parties in Interest "Sufficiently Protected" and Will Not Be "Manifestly Contrary to the Public Policy of the United States".........51

(iv)   Granting the Discretionary Relief Requested Meets the Traditional Standards of "Comity" Under Section 1507(b) .........................................62

NOTICE...............................................................................................................................66

NO PRIOR REQUEST ........................................................................................................66

ii

Johan Bastin (the "Petitioner"), duly appointed by a November 16, 2016 resolution (the "Resolution of Appointment") of the board of directors of DTEK Finance plc ("DTEK" or the "Debtor"), a public company limited by shares incorporated in England and Wales on February 27, 2013 with registered number 08422508, and declared as authorized to act by a December 2, 2016 order (the "Convening Court Order") of the Chancery Division (Companies Court) of the High Court of Justice of England and Wales (the "English Court") as the foreign representative of a voluntary scheme of arrangement (the "Scheme") concerning the Debtor before the English Court (the "UK Proceeding"), acting in such capacity and by and through his undersigned counsel, respectfully submits this verified petition in furtherance of the voluntary petition for relief under chapter 15 of Title 11 of the United States Code (the "Bankruptcy Code")[1] filed concurrently herewith [Docket No. 1] (together herewith, the "Petition") for entry of an order (i) recognizing the UK Proceeding as a foreign main proceeding pursuant to sections 1515 and 1517 of the Bankruptcy Code, (ii) granting related relief pursuant to section 1520 of the Bankruptcy Code, and (iii) granting further permanent relief pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1521(a), and 1525(a) of the Bankruptcy Code in support of the Scheme, if such Scheme is duly approved by the requisite number of creditors holding the requisite amount of affected debt and sanctioned by the English Court, all in accordance with applicable English law.  In support of the Petition, the Petitioner has filed concurrently herewith and incorporated herein by reference (i) the *Declaration of Johan Bastin Pursuant to 28 U.S.C. § 1746* (the "Bastin Declaration")[2] and (ii) the *Declaration of John Houghton Pursuant to 28 U.S.C. § 1746* (the "Houghton Declaration"), and respectfully represents as follows:

---

[1]     Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

[2]     A true and correct copy of the Convening Court Order is attached to the Bastin Declaration as Exhibit A.

1

## PRELIMINARY STATEMENT

1.      This chapter 15 case (the "Chapter 15 Case") is brought in the United States
Bankruptcy Court for the Southern District of New York (the "Court") on behalf of the Debtor as
an ancillary proceeding for the foreign main proceeding pending before the English Court.  The
Debtor is organized under the laws of England and Wales and has its center of main interests in
the United Kingdom.  The Debtor serves as a special purpose vehicle and is wholly-owned by
DTEK Energy B.V. ("DEBV") (DEBV and its subsidiaries (consisting of all companies in which
DEBV holds a majority of the shares or voting rights), including the Debtor, are collectively
referred to herein as the "Group").

2.      The Group operates the largest privately-owned energy company in Ukraine as
measured by metric tons of coal produced, net generation of electricity, and electricity
distributed.  The Debtor was incorporated to facilitate the raising of capital through the issuance
of the Existing Notes (as defined herein), the proceeds of which were loaned to its operating
affiliates.  The indentures governing the Existing Notes, which will be restructured pursuant to
the Scheme, are governed by New York law.   Neither the Debtor's parent nor its single
subsidiary have commenced insolvency proceedings in the English Court or any other court
within any jurisdiction.

3.      Since the Debtor is a special purpose vehicle and not an operating company, its
ability to repay its debts is entirely dependent on the payments it collects from operating and
other companies within the Group by way of debt service for the loans the Debtor has extended
to such operating companies as well as incurring intragroup debt.  As a result of the deteriorating
geopolitical and economic situation in Ukraine since 2014, and the attendant impact on the
Group's businesses, the Group's operating companies have been unable to generate sufficient

2

operating cash flow to continue to satisfy their financial obligations (including their obligations to the Debtor), which has resulted in the Debtor being unable to satisfy its obligations in connection with the Existing Notes.

4.    On April 26, 2016, the Debtor entered into the Standstill Scheme (as defined herein) with respect to the Existing Notes to protect against enforcement action by Noteholders (as defined herein) in respect of any events of default thereunder.  The Standstill Scheme (and the moratorium thereunder) terminated by its terms on October 28, 2016.[3]  Concurrently with negotiating the Standstill Scheme and since entering into it, the Debtor has been in active negotiations with its creditors regarding a holistic restructuring of the Group's financial indebtedness, which includes the Existing Notes and the Bank Facilities (as defined herein).

5.    These negotiations recently resulted in an agreed framework for a financial restructuring of the Existing Notes that, if approved by the Noteholders (in accordance with the requisite consent thresholds discussed below) and the English Court, will be implemented through the Scheme in the United Kingdom.  The Noteholders are the only creditors of the Group that will have their rights affected by the Scheme.[4]  Under applicable English law, at least seventy-five percent in amount and a majority in number of the Noteholders (who are present and voting in person or by proxy) at the Scheme Meeting (as defined herein) must vote to approve the Scheme in order for it to become binding on all Noteholders.  As of December 1, 2016, holders of 83.08% of the value of the outstanding Existing Notes have entered into a Lock-

---

[3]    As part of the proposed restructuring, the Noteholders party to the Lock-Up Agreement (as defined herein) have agreed to continue to forbear from the exercise of remedies against the Group until the earlier of (i) the Restructuring Effective Date (as defined herein) and (ii) the date on which the Lock-Up Agreement is terminated in accordance with its terms.

[4]    The Bank Lenders (as defined herein) may elect to exchange debt under their existing Bank Facilities up to a maximum aggregate amount of US $300 million in principal amount (plus any interest that has accrued or capitalized prior to the date of such exchange) into additional New Notes at par value.  While negotiations with the Bank Lenders are ongoing, a comprehensive restructuring of the Bank Facilities has not yet been finalized as of the date of the Petition.

3

Up Agreement, dated as of November 18, 2016, entered into among DEBV, the Debtor, and

certain Noteholders (the "Lock-Up Agreement"), pursuant to which the Noteholders party

thereto have agreed to (i) support the terms of the restructuring that will be implemented through

the Scheme (including to vote in favor of the Scheme) and (ii) not sell or otherwise transfer their

Existing Notes until the earlier of (x) the Scheme Meeting and (y) the date on which the Lock-

Up Agreement is terminated in accordance with its terms.

6.      If holders of the Existing Notes approve the Scheme, the Scheme provides that, in

exchange for the cancellation and discharge of their claims, and their release of the Released

Parties (as defined in Appendix 1 to that certain Deed of Release, which is attached as Schedule

2 to the Explanatory Statement), the Noteholders will be entitled to receive: (1) a restructuring

fee (subject to various milestones set forth in the Scheme); and (2) the New Notes (as defined

herein).[5]   In addition, Noteholders who sign or accede to the Lock-Up Agreement and vote in

favor of the Scheme will be entitled to receive an additional lock-up fee.  All Noteholders had

the opportunity to accede to the Lock-Up Agreement until December 1, 2016.

7.      This Chapter 15 Case serves a critical role in effectuating the Scheme, principally

by preventing the Debtor's stakeholders from commencing actions in the United States that are

more properly the subject of the UK Proceeding.  As set forth herein, granting the requested

relief is appropriate because, among other reasons, the UK Proceeding, which is a proceeding in

respect of a United Kingdom scheme of arrangement, is a foreign proceeding, the Debtor's

center of main interests is located in the United Kingdom, and the Foreign Representative is a

proper "foreign representative."  Moreover, the UK Proceeding grants substantial due process

rights to the Debtor's affected creditors (*i.e.*, the Noteholders) that sufficiently protect their

---

[5]      This scenario is referred to in the various Scheme documents and herein as the "Restructuring."

interests, and both the procedures applicable in the UK Proceeding and the substantive restructuring under the Scheme are consistent with, and not manifestly contrary to, U.S. public policy.

## BACKGROUND

### A.    The Debtor and Its Corporate Group Structure

8.    The Debtor is a public company limited by shares that was incorporated in England and Wales on February 27, 2013.  The Debtor's registered number is 08422508, and its registered office is located at 3rd Floor, 11-12 Street, St. James's Square, London SW1Y 4LB, United Kingdom.  The Debtor is part of the Group whose ultimate holding company is DEBV. The Group is wholly owned and controlled by SCM (System Capital Management) Limited ("SCM") through its ownership of DTEK B.V., a leading financial and industrial group in Ukraine that was established and is currently wholly owned by Mr. Rinat Akhmetov.[6]  SCM manages and controls companies in the mining and metals, coal mining, power generation, electricity distribution, banking and insurance, and telecommunications markets.

9.    The Debtor has never been, and is not currently, an operating company.  The Debtor  was incorporated to facilitate capital raising on behalf of the Group.  As of the date of this Petition, the Debtor's principal assets are (i) equity interests in DTEK Investments Ltd., a company incorporated in England and Wales, and (ii) receivables under certain intercompany loans (the "Intercompany Loans").  The Debtor's property within the territorial jurisdiction of the United States consists of residual interests in funds held on deposit in a bank account at Citibank N.A. in the Borough of Manhattan in the City of New York, New York in the name of the Debtor's U.S. bankruptcy counsel (the "Bank Account").  On November 25, 2016, the Debtor

---

[6]    A simplified organizational chart of the Debtor is attached to the Bastin Declaration as Annex I.

deposited $270,000 into the Bank Account on, and, as of the date of this Petition, the balance of funds in the Bank Account is $270,000.

**B.**      **The Business and History of the Debtor and the Group**

10.      The Group operates the largest privately-owned energy company in Ukraine as measured by metric tons of coal produced, net output of electricity, and electricity distributed. Its businesses comprise three principal segments: (i) coal mining; (ii) power and heat generation; and (iii) electricity and heat distribution.  The Group's enterprises form a vertically integrated production chain in which its coal mining subsidiaries produce coal primarily for delivery to and use by the Group's thermal power generation subsidiaries.  The latter, in turn, generate electricity, part of which is distributed to end-customers by the Group's electricity distribution companies.  These end-customers primarily consist of residential, public sector and industrial customers in Ukraine.  The Group's power generation subsidiaries also sell electricity directly to large industrial companies in Ukraine.  In addition, the Group exports coal and electricity.

                          **(i)      Coal Mining**

11.      The Group owns, or leases or has concession rights in respect of, and operates twenty-eight coal mines and twelve coal enrichment plants.  The Group mines thermal and coking coal that is prepared at its own enterprises.  It has an extensive commercial product line, including coal concentrate for power generation and coking, as well as special fuel for household needs.

12.      In 2013, 2014, and 2015, the Group's coal mines produced in aggregate 41.4 million, 37.1 million, and 28.7 million metric tons of coal, respectively.  The decline in production in 2015 is primarily attributable to the overall reduction of coal production in the Donbass region in Ukraine, which has been affected by military conflict.

EU-DOCS\16262225.13

13.      In 2013, 2014, and 2015, the Group sold 29.2 million, 24.0 million, and 20.6 million metric tons of marketable thermal coal (*i.e.*, coal typically used for generating steam for power plants), respectively.    During those same years, the Group exported 4.7 million, 4.1 million, and 1.4 million metric tons of coal, respectively, primarily to consumers in Russia, Turkey, Morocco, the United States, and countries in Europe for use in thermal power plants and for industrial use.

(ii)      <b>Power Generation</b>

14.      The Group is also a significant player in Ukraine's power generation market.    The Group's power generation subsidiaries operate ten thermal power generation plants and two combined heat and power plants.    The Group's power plants primarily purchase and use coal produced and supplied by the Group's coal mining subsidiaries.

15.      In 2013, 2014, and 2015, the Group generated a total net output of 53.1 TWh, 47.1 TWh, and 37.7 TWh of electricity, respectively.    The decrease in production in 2015 is attributable to a reduction in electricity consumption in Ukraine of 11.3% from the prior year, coupled with imports from the Russian Federation and export restrictions.

16.      Until the second half of 2014, when military conflict in the Donetsk and Lugansk regions intensified, the coal produced by the Group's coal mines was generally sufficient to meet the demand of the Group's power plants, although the Group's power generation subsidiaries purchased coal from third parties when coal prices were favorable.    After the second half of 2014, to cover the shortage in coal production caused by disruptions from ongoing military conflict and to secure the generation of electricity in Ukraine, the Group imported approximately 1.7 million metric tons of coal for its Ukrainian power generation operations.    In the first quarter of 2015, due to disruptions in the delivery system and infrastructure of coal mined in the region affected by civil disturbances, the Group's power generation subsidiaries were forced to import

7

approximately 0.4 million metric tons of coal. Even though these imports constituted a relatively small portion of the Group's own fuel stock consumption, they were significant in their financial impact.

### (iii) Electricity Distribution

17.    The Group is one of the largest electricity distribution companies in Ukraine based on volume of electricity distributed to end customers, which include households and commercial consumers in Kyiv and the Donetsk and Dnipropetrovsk regions of Ukraine. The Group owns and operates five electricity distributing companies: DTEK Power Grid LLC, DTEK Energougol Ene PrJSC, DTEK Donetskoblenergo PJSC, DTEK Dniprooblenergo PJSC, and Kyivenergo PJSC.

18.    In the years ending on December 31, 2013, 2014, and 2015, the Group accounted for 39.3%, 38.3%, and 33.5%, respectively, of total electricity transmission in Ukraine, according to Ukraine's transmission regulatory body, NERC. The drop in transmission in 2015 was mainly driven by decreased electricity supplies in Donbass as a result of military conflict, which caused decreased production by industrial enterprises and households.

19.    The Group also exports electricity to Poland, Hungary, Moldova, and Belarus and certain other Central and Eastern European countries through subsidiaries DTEK Power Trade LLC, DTEK Skhidenergo LLC, DTEK Pavlogradugol PrJSC, and DTEK Trading LLC. In the years ending December 31, 2013, 2014, and 2015, the Group exported 9.8 TWh, 8.0T Wh, and 3.6 TWh, respectively. The main factors affecting the decline in export transmission in 2015 were the decision of the Ministry of Energy and Coal Industry to limit electricity exports (effective August 2014) and, to a much lesser extent, weakening demand from abroad.

EU-DOCS\16262225.13

C.      **Summary of the Debtor's and Group's Capital Structure**

20.     As of September 30, 2016, the Group's total principal debt amounted to approximately US $2,168 million (excluding accrued interest), comprised of (i) the Existing Notes, (ii) the Bank Facilities (including the bilateral loans, the club loans, the PXF facility, and mark-to-market swaps), and (iii) the Essential Bank Lines (as defined herein).

21.     Obligations of the Debtor.  As of October 28, 2016, the Debtor has outstanding indebtedness of approximately US $965 million.  Of this debt, approximately US $806 million (including accrued interest) is owed to the beneficial holders of the 2013 Notes (as defined herein) (the "2013 Noteholders"), and approximately US $159 million (including accrued interest) is owed to the beneficial holders of the 2015 Notes (as defined herein) (the "2015 Noteholders", and, together with the 2013 Noteholders, the "Noteholders").

22.     DTEK issued those certain US $750 million 7.875% senior notes due April 4, 2018 (Regulation S Notes ISIN: USG2941DAA03 and Rule 144A Notes ISIN: US23339BAA70) (the "2013 Notes") pursuant to an indenture dated April 4, 2013, as amended by that certain supplemental indenture dated April 30, 2013 (the "2013 Notes Indenture").

23.     The 2013 Notes and those certain US $160 million 10.375% senior notes due March 28, 2018 (Regulation S Notes ISIN: USG2941DAB85) (the "2015 Notes", and, together with the 2013 Notes the "Existing Notes"), which were issued by DTEK pursuant to an indenture dated April 28, 2015  (the "2015 Notes Indenture" and, together with the 2013 Notes Indenture, the "Indentures"),[7] are unsecured obligations of DTEK ranking *pari passu* as between themselves.  The following entities guaranteed the Existing Notes on a joint and several basis: (a)(i)DTEK Trading LLC, (ii) DTEK Skhidenergo LLC, (iii) DTEK Pavlogradugol PrJSC, (iv)

---

[7]      Copies of the 2013 Notes Indenture and the 2015 Notes Indenture are annexed to the Bastin Declaration as Exhibits B and C, respectively.

DTEK Mine Komsomolets Donbassa PJSC, (v) Tehrempostavka LLC, (vi) DTEK Power Grid LLC, (vii) DTEK Energy LLC, (viii) DTEK Dobropolyeugol LLC, (ix) DTEK Rovenkyanthracite LLC, (x) DTEK Sverdlovanthracite LLC, (xi) DTEK Dniproenergo PJSC, (xii) DTEK Zakhidenergo PJSC, (xiii) Kyivenergo PJSC, (xiv) DTEK Energougol Ene PrJSC and (xv) PJSC DTEK Dniprooblenergo (collectively, the "Sureties"), and (b)(i) DTEK Holdings Ltd, (ii) DEBV, (iii) DTEK Trading Limited, (iv) DTEK Investments Limited, and (v) DTEK Trading SA (collectively, the "Guarantors").

24.    The net proceeds from the Existing Notes were applied to repay amounts of the Group's public corporate debt and for general corporate purposes, including routine capital expenditure to maintain the level and improve the efficiency of operations and acquisitions. The Existing Notes were admitted to the official list of the Irish Stock Exchange on April 4, 2013 and April 28, 2015 (as applicable) and remain so admitted on the date hereof.

25.    Obligations of the Group: Bank Facilities.  As of September 30, 2016, the Group had outstanding bank debt facilities (the "Bank Facilities") with a number of international and Ukrainian commercial banks and Russian/Ukrainian state and commercial banks (collectively, the "Bank Lenders") in an aggregate amount of approximately US $1,210 million. This amount excludes the Essential Credit Lines, of which there was approximately US $34.6 million outstanding as of September 30, 2016.[8]

---

[8]    "Essential Credit Lines" means (i) the EUR 9,921,598.68 Export Credit Facility Agreement dated November 9, 2011 between DTEK Holdings Ltd and the lender thereto, in an amount not to exceed EUR 9,921,598.68, (ii) the US $5,086,299.88 Facility Agreement dated February 26, 2013 between DTEK Holdings Ltd and the lender thereto, in an amount not to exceed US $5,086,299.88, and (iii) the UAH 800,000,000 Facility Agreement dated September 4, 2015 between DTEK Zakhidenergo PJSC and the lender thereto, in an amount not to exceed UAH 800,000,000, in each case as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time (subject in each case to the limitations on amounts available under each such facility (including any replacements or refinancings thereof) set forth in this definition).

26.     <u>Bilateral Loans</u>.   The Group has outstanding bilateral loans with an aggregate outstanding principal amount of US $408 million as of September 30, 2016.

27.     <u>Club Loans</u>.   The Group has outstanding club loans from five lenders, with an aggregate outstanding principal amount of US $228 million as of September 30, 2016.   These loans have similar guarantees and suretyships to the Existing Notes, with the exception that DTEK Trading SA and the Debtor are not parties.

28.     <u>PXF Facility</u>.  The Group has an outstanding pre-export facility ("<u>PXF Facility</u>"), comprised of two tranches and five lenders, under which the aggregate outstanding principal amount owed is US $337 million as of September 30, 2016.  The PXF Facility lenders benefit from assignments of rights under various export and sales contracts and hold bank account pledges over certain accounts used for certain export sales.   There are also guarantees or suretyships from five entities (in addition to the borrower, DTEK Trading SA), which includes three trading companies (DTEK Pavlogradugol PrJSC, DTEK Rovenkyanthracite LLC, and DTEK Sverdlovanthracite LLC).

29.     <u>Mark-to-Market Swaps</u>.  As of September 30, 2016, the mark-to-market principal amount under the cross-currency interest rate swap transactions entered into between the Sberbank of Russia and DTEK Holdings Ltd. under the 2002 ISDA Master Agreement, dated December 19, 2011 and as amended from time to time, totaled approximately US $237 million.

**D.     The Foreign Representative**

30.     Since May 6, 2011, the Petitioner has been a member of the supervisory board of DEBV, which is the sole shareholder of the Debtor.  The Petitioner assists in the development and implementation of strategy and high-level management decisions relating to the Group, including the Debtor.  By virtue of this role, the Petitioner is fully aware of the Debtor and the Group's financial affairs, has been closely involved in the Debtor's efforts to restructure its

11

liabilities, and has a thorough understanding of the restructuring contemplated under the Lock-Up Agreement and the Scheme.  As noted above, the Petitioner was duly appointed foreign representative pursuant to the Resolution of Appointment.  Pursuant to the Convening Court Order, the English Court declared that the Petitioner is the appointed foreign representative and authorized him to act in that capacity in respect of the UK Proceeding in this Chapter 15 Case and regarding the relief requested by this Petition.

E.      **Events Preceding the Commencement of the UK Proceeding**

        (i)      **Geopolitical and Economic Situation in Ukraine**

31.     The rapid deterioration of geopolitical, social and economic conditions that occurred in Ukraine in 2014 and continued, albeit at a slower rate, for most of 2015 and the first part of 2016, has led to: (i) the disruption, suspension and/or reduction of operations at some of the Group's production assets; (ii) a decline in market conditions and energy consumption in Ukraine; (iii) the virtual closing of commercial international financial markets for Ukrainian borrowers and issuers; (iv) an increase in accounts receivable from electricity and heat customers for the supplied electricity and heat (the highest concentration of delinquent accounts was located in the regions that are outside of the control of Ukraine's government (the "NCT Zone")); and (v) insufficient level of the average power tariffs set by NERC (the country's energy sector regulator) for the thermal power generation in 2015 and the first half of 2016, which fell short of the level needed to cover the Group's operational costs including the costs of finance and maintenance capital expenditure.

32.     As discussed in greater detail below, the political and economic issues that Ukraine has faced since late 2013/early 2014 (and which have, since 2016, begun to stabilize) have been well documented.  In summary, they include:

EU-DOCS\16262225.13

(a)     civil unrest in Crimea and the Donbass region in the East of Ukraine and the annexation of Crimea by Russia and the de facto succession of a main part of the Donbass region;

(b)     the severe contraction of the Ukrainian economy by 6.8% in 2014 and 9% in 2015 according to the IMF;

(c)     the substantial depreciation of the hryvnia (UAH) against the U.S. Dollar, the Euro and the Russian Ruble; and

(d)     significant infrastructure damage, which added to the logistical difficulties of the movement of goods and people between the Donbass region and the rest of Ukraine.

33.     The consequences of these developments on the Group's financial and operational performance can be summarized as follows:

(a)     certain of the Group's operations have been suspended and coal production and electricity generation have decreased significantly;

(b)     various of the Group's assets have been expropriated by certain state bodies;

(c)     as the vast majority of the Group's revenues are generated in hryvnia and the vast majority of the Group's indebtedness is generated in U.S. Dollars, Euros and Russian Rubles, the Group has been unable to service its debt;

(d)     the Group's coal exports (and the attendant income from such exports) have seen a very steep drop as a result of decreased global demand for coal and lower world market prices for coal;

(e)     state established electricity tariffs have been at a level that does not allow for the sustainable financial functioning of the Group; and

(f)     severe liquidity constraints that have started to ease only since the middle of 2016.

34.     As a result of hostilities in the NCT Zone, operations at certain of the Group's production facilities located in or near the NCT Zone have been temporarily suspended since mid-2014, and production at its other coal mining assets located in the affected regions has been reduced.  In 2016, operational conditions in these territories began to stabilize and a number of coal and electricity production facilities in such areas have resumed operations, albeit at levels

13

short of pre-2014 levels.  The transportation networks the Group uses to transport coal and equipment within and from the NCT Zone have been severely disrupted as a result of military activity and arbitrary stoppages and seizures.  Over the course of 2015 and most of 2016, such networks have been restored and are now functioning without major disruptions, though at a lower capacity level than prior to 2014.  The Group's businesses affected by the NCT Zone accounted for 8.5% of power generation, 32% of power distribution, and 22% of coal mining volumes during the six-month period ending on June 30, 2016.

35.    In January 2015, the Crimea State Council voted to expropriate the Crimean assets of the Group's subsidiary, DTEK Krymenergo PJSC.  Prior to its expropriation, DTEK Krymenergo PJSC distributed approximately 8.1% of the Group's total electricity distribution volume in 2014.

36.    Coal production from the Group decreased 22.7% between the twelve-month period ending on December 31, 2014 and the twelve-month period ending on December 31, 2015.  There are indications that the market has bottomed, as evidenced by only a 0.8% decrease during the six-month period ending on June 30, 2016 (compared with the six-month period ending on June 30, 2015).  Continued liquidity shortfalls have had a negative impact on the coal segment and have prevented the Group from making the necessary investments in the maintenance of mining equipment, which led to disruptions and decreasing productivity.

37.    Due to operational and logistical difficulties, as well as the sharp contraction of Ukraine's economy, the Group's electricity generation decreased by 20.1% between the twelve-month period ending on December 31, 2014 and the twelve-month period ending on December 31, 2015.  The level of electricity generation decreased by a further seven percent during the six-month period ending June 30, 2016 (compared with the six-month period ending on June 30,

2015); however, it is my understanding that this latter decrease may have been due, in part, to seasonal and technical changes in demand in the wholesale market. Electricity transmission has also declined significantly since 2014, by 16.2% during the twelve-month period ending on December 31, 2015 (compared with the twelve-month period ending on December 31, 2014). As with coal production and, possibly, electricity consumption, there are signs that the electricity transmission markets have bottomed or are in the process bottoming out. During the six-month period ending on June 30, 2016 (compared with the six-month period ending on June 30, 2015) transmission volumes decreased only by 0.9%, which is well within the range of normal fluctuations.

38.     The deteriorating geopolitical environment in the Group's core geographic region has led to a sharp decline in overall trading activity, market demand, and macroeconomic outlook. As of June 30, 2016 and December 31, 2015, respectively, approximately 98% and 95% of the Group's borrowings were denominated in either U.S. dollars, Euros, or Russian Rubles, whereas approximately 94% and 93% of its revenues in 2015 and during the six-month period ending June 30, 2016, respectively, were generated in Ukraine Hryvnia. Therefore, based on the prevailing exchange rates of the National Bank of Ukraine, the 52%, 36%, and 9% devaluation in 2015 alone of the Hryvnia against the U.S. dollar, the Euro, and the Russian Ruble, respectively, and a further devaluation of approximately 4%, 5%, and 17% of the Hryvnia against the U.S. dollar, the Euro, and the Russian Ruble, respectively, for the six-month period ending on June 30, 2016, has adversely impacted the Group's financial position and the Debtor's ability to service its indebtedness.

39.     As of June 30, 2016, the Group had significant accounts receivable from the Ukrainian government and entities dependent on government-financing, including net VAT

15

recoverable of UAH 1,260 million (or US $50.7 million), heat tariff compensation of UAH 485 million (or US $19.5 million), and receivables from Energorynok SE and various water and heat supply companies of UAH 6,222 million (or US $250 million) and UAH 1,652 million (or US $66.5 million), respectively.  The Group's senior management is in continuous dialogue with the government agencies regarding settlement of these receivables—either through extended payments or through off-sets of monies owned by Group companies to government entities or departments.

40.      As a result of the factors described in paragraphs 31 to 39, until recently, the Group has been operating with severely constrained and rapidly deteriorating liquidity during most of 2015.  Weekly average available cash balances hit a low of US $13.1 million on January 1, 2016, and only since August have they risen towards what the Group's senior management considers the critical minimum level of US $110 million.  As of the date hereof, the trend of weekly average available cash balances remains positive with such balances at or above the aforementioned critical minimum level.  Shortfalls in the Group's operating cash inflows were effectively financed by a reduction of capital expenditure for maintenance purposes, which has resulted in the Group's operations being more vulnerable to interruptions caused by breakdowns or malfunctioning of equipment and facilities.  The deferral of tax payments, as well as non-payment or late payments to the Group's suppliers, have also occurred.  None of these actions are sustainable, and the Group appears to have tested the limits of funding working capital by stretching operating expenses.  Looking ahead, in order to safeguard the Group's operational capabilities and its capacity to generate the cash flow needed to meet its debt service obligations—on the terms contemplated by the Restructuring—investment in capital stock,

mainly to be used for deferred maintenance and the prompt payment of suppliers, will be a priority.

41.    As a consequence of this constrained liquidity position, and as described in greater detail below, the Group has failed to make certain interest and principal payments, and the Group requires a full-scale restructuring of its capital structure, including a restructuring of the Existing Notes.

42.    Despite challenges that remain, the political, economic and operational environment in which DTEK operates has been gradually improving.    Examples of such improvement include the following:

> (a)    even though it is far from being resolved, the security situation in the NCT Zone has stabilized, thereby allowing the company to restore some degree of normality in its operations;
>
> (b)    under pressure from the European Union and the IMF, the Ukrainian government has started a process of energy sector reform, including a thorough overhaul of the energy market.    Important pieces of legislation have been enacted that have contributed to making the regulatory environment for DTEK's operations less arbitrary and more predictable; and
>
> (c)    energy sector reforms have led to the recent introduction of a tariff-setting mechanism that is based on market factors and promotes longer term predictability and, as a consequence, buttresses the long-term financial viability of DTEK's operations.

43.    Although DTEK cannot guarantee (even if the Restructuring is successfully completed) that the Group's business will be successful in the future, DTEK's management and the Board believe that, as a result of the stabilization of the political, economic and security environment in Ukraine, the Group's financial and operational outlook is more positive than at any time in the past two years, and, therefore, DTEK would be in a better position to service its debt obligations, as contemplated by the Restructuring.    DTEK's management and the Board

17

also believe that implementation of the Restructuring is in the best interests of the relevant stakeholders taken as a whole (including the Noteholders).

### (ii)   The Debtor's Liquidity Constraints

44.    On March 28, 2016, an interest payment was due on the 2015 Notes in the amount of US $8.3 million (the "March Coupon"), and on April 4, 2016, an interest payment was due on the 2013 Notes in the amount of US $29.5 million (the "April Coupon").  Due to the Group's poor financial position and based on the Debtor's available cash at that time, it was expected that the Debtor would be unable to pay the March Coupon in full by April 26, 2016 (the date on which the 30-day grace period in respect of the March Coupon expired) and the April Coupon by May 3, 2016 (the date on which the 30-day grace period in respect of the April Coupon expired).

45.    Failure to pay the March Coupon (absent a standstill or other waiver from the applicable Noteholders) would result in a payment event of default, whereupon the indenture trustee for holders of the 2015 Notes could have, at its discretion, and would have been required to, if so requested by holders of at least twenty-five percent in principal of the 2015 Notes, give notice to DTEK that the 2015 Notes are due and payable in full.  Upon any such acceleration, a cross-default event of default would be triggered under the 2013 Notes.  In addition, failure to pay the April Coupon (absent a standstill or other waiver from the applicable Noteholders) would result in an independent payment event of default in respect of the 2013 Notes.  Similar to the 2015 Notes, the 2013 Notes could subsequently be accelerated.  The March Coupon was not paid on April 26, 2016, and the April Coupon was not paid on May 3, 2016.

46.    Accordingly, in order to prevent the occurrence of any payment events of default under the Existing Notes, which would give rise to the right to accelerate the Existing Notes, DTEK applied to the English Court to implement a standstill of the Existing Notes by way of a

scheme of arrangement, which was subsequently sanctioned by the English Court and became binding on all Noteholders on April 26, 2016 (the "Standstill Scheme").

47.    The Group has also failed to make certain principal and interest payments under its Bank Facilities.  As of September 30, 2016, payment defaults under the Bank Facilities totaling approximately US $748.4 million have occurred.

48.    On September 21, 2016, DEBV entered into a standstill arrangement (the "Bank Standstill") with more than seventy-five percent of the Bank Lenders as of that date.  Various other Bank Lenders have acceded to the Bank Standstill since that date.  The Bank Standstill provided a moratorium on enforcement action by the Bank Lenders who signed the Bank Standstill until January 28, 2017 (subject to certain early termination events).  The terms of the Bank Standstill are materially the same as the terms provided to the Noteholders under the Standstill Scheme.  All Bank Lenders who have not signed the Bank Standstill have been voluntarily acting and forbearing in accordance with the general terms of the Bank Standstill and have not taken any enforcement action to date.

49.    The Bank Lenders have been kept informed of the negotiations between the Debtor and the Steering Committee (as defined herein), and are familiar with the details of the terms of the Scheme.  The Group continues to negotiate with the Bank Lenders on the terms of a restructuring of their obligations.  The restructuring contemplated by the proposed Scheme does not purport to affect the rights of the Bank Lenders, except that, as noted above, the Bank Lenders may elect to swap up to a maximum aggregate amount of US $300 million under the existing Bank Facilities into additional New Notes at par.

### (iii)    Long-Term Restructuring Efforts

50.    DTEK's board, together with its financial and legal advisors, have considered a number of alternatives to address the Group's debt burden (including the Existing Notes).

19

DTEK's board ultimately determined that the Scheme placed the Group on a path that provides the best opportunity to achieve a comprehensive, global solution to its debt burden.

51.    Beginning in January 2016, the Group and its advisors engaged in formal negotiations with an ad hoc committee of Noteholders (the "Steering Committee")[9] and its legal and financial advisors regarding the terms of a restructuring of the Existing Notes that would allow the Group's business to continue as a going concern.  The Steering Committee holds approximately thirty-three percent of the Existing Notes as of the date hereof.[10]

52.    After several months of intense effort, negotiation, and deliberation with the Steering Committee, on November 18, 2016, the Group and the Steering Committee agreed to the terms of the Restructuring.  The terms of the Restructuring are set forth in the Binding Note Term Sheet (the "Term Sheet"), which is attached as Schedule 1 to the Lock-Up Agreement and Schedule 2 to the Practice Statement Letter.[11]  The Lock-Up Agreement binds the Noteholders party thereto to support and vote in favor of a scheme implementing terms set forth in the Term Sheet.  In general terms, and as described in greater detail below, the Restructuring contemplates a number of steps designed to facilitate an exchange of the Existing Notes for newly-issued notes.

53.    As an incentive to enter into the Restructuring, if the Scheme is sanctioned, all Noteholders (whether or not they are party to the Lock-Up Agreement) are entitled to receive a restructuring fee, payable upon the Restructuring becoming effective (the "Restructuring

---

[9]    The Steering Committee consists of the following members:  Ashmore Investment Management Limited, Ashmore Investment Advisors Limited, VR Advisory Services Ltd, Spinnaker Capital Limited, and Portland Worldwide Investments Ltd.

[10]    The Group has concurrently been negotiating a potential restructuring of the Bank Facilities with a group of Bank Lenders; however, a definitive agreement with such lenders has not yet been reached, and the proposed Scheme only pertains to the Existing Notes.

[11]    This summary of the restructuring transactions is provided for the benefit of the Court and other parties in interest and is qualified in its entirety by reference to the applicable provisions of the Term Sheet.

<u>Effective Date</u>"), equal to their *pro rata* share of 0.75% of the outstanding principal amount of Existing Notes (including accrued and capitalized payment-in-kind interest) (the "<u>Restructuring Fee</u>"). In addition, if the Scheme is sanctioned, Noteholders who (i) sign or accede to the Lock-Up Agreement (as applicable) by 5:00 p.m. (London time) on December 15, 2016, (ii) complete and submit to Euroclear Bank S.A./N.V. ("<u>Euroclear</u>") or Clearstream Banking, *société anonyme* ("<u>Clearstream</u>") a valid voting instruction in favor of the Scheme, (iii) submit an account holder letter in favor of the Scheme to Lucid Issuer Services Limited (in its capacity as information agent under the Scheme, the "<u>Information Agent</u>")[12] by December 16, 2016, and (iv) not have breached any provision of the Lock-up Agreement are entitled to receive an additional fee (the "<u>Lock-Up Fee</u>") equal to their *pro rata* share of the sum of (x) 0.50% of the outstanding principal of Existing Notes eligible to receive the Lock-Up Fee and (y) the Coupon Payments (as defined in the Lock-Up Agreement) in respect of such Existing Notes. The Lock-Up Fee equates to maximum total amount of approximately 0.76% of the outstanding principal of a Noteholders' holdings of Existing Notes.

## F.     **<u>The Debtor's Connections with the United Kingdom</u>**

54.     For the English Court to have jurisdiction to commence the UK Proceeding, the Debtor needed to have a "sufficient connection" to the United Kingdom. Under English law, the requisite sufficient connection can be established by a company if its center of main interests is in the United Kingdom. In addition, the English Court must find that the Scheme is likely to be recognized and enforced in the other jurisdictions in which the Debtor has assets. A center of main interests in the United Kingdom also assists in achieving recognition of a scheme in other jurisdictions, including the United States, as a "foreign main proceeding."

---

[12]     On or around October 31, 2016, the Group engaged the Information Agent to contact and engage with Noteholders outside of the Steering Committee in relation to the Restructuring.

55.     DTEK is incorporated under the laws of England and Wales as a public company limited by shares.  Its registered office is located at 3rd Floor, 11-12 Street, St. James's Square, London SW1Y 4LB (the "London Office").  All of DTEK's statutory books, records, and corporate documents are stored at the London Office.

56.     In addition, the Articles of Association of DTEK Finance plc (the "Articles") provide, *inter alia*, that:

    i.    DTEK's management and control shall rest in the United Kingdom;

    ii.    all board meetings shall take place in the United Kingdom;

    iii.    all General Shareholders' Meetings (as defined in the Articles) shall take place during a business day in Ukraine and the United Kingdom, unless otherwise agreed upon by all the Shareholders; and

    iv.    the instrument appointing a proxy and the power of attorney or other authority to be used in connection with voting shall be deposited at DTEK's registered office (which is located in the United Kingdom) or at such other place within the United Kingdom.

Bastin Declaration, Ex. D at §§ 47, 73, 104.

57.     DTEK's full legal name is displayed on a fully visible plaque in front of the London Office, which consists of a fully-serviced suite with a number of meeting rooms with internet and phone access.  The telephone number for the London Office is +44 (0)020 7268 2430.

58.     DTEK's corporate director, Accomplish Corporate Services Limited, which undertakes the day-to-day management of the Debtor, has its registered office in London. DTEK's company Secretary, Paul John Cooper, is based in London, with his service address of 3rd Floor, 11-12 Street, St. James's Square, London SW1Y 4LB.  Mr. Cooper files annual and semi-annual accounts and annual returns to the Companies House.

EU-DOCS\16262225.13

59.     DTEK is a tax resident of the UK and has been assigned a Unique Taxpayer Reference Number by Her Majesty's Revenue and Customs for corporation tax purposes.   A copy of a letter confirming this is annexed to the Bastin Declaration as Exhibit E.

**G.      Commencement of the UK Proceeding and Activity to Date**

60.     The Debtor applied to the English Court on November 28, 2016, for an order directing it to convene a meeting (the "Scheme Meeting").   Notice of the application was delivered to the Noteholders in accordance with English law by means of a "practice statement" letter, dated November 18, 2016 (the "Practice Statement Letter").[13]   The Practice Statement Letter was sent to the Noteholders via the Depository Trust Company, Euroclear, and Clearstream (collectively, the "Clearing Systems").   An electronic version of the Practice Statement Letter was also made available on a website (www.lucid-is.com/dtek) established by the Information Agent (the "Scheme Website") and will be generally available for inspection at the offices of the Information Agent.   The Practice Statement Letter will also be published on the Group's website.

61.     The Practice Statement Letter notified the Noteholders of:

(a)      the fact that the Scheme was being proposed;

(b)      the objectives of the Scheme;

(c)      the basis on which DTEK considers that the English Court has jurisdiction as regards to the Scheme; and

(d)      the proposed class composition of the creditors for the purpose of voting on the Scheme.

62.     The Practice Statement Letter gave notice to all the Noteholders that DTEK was intending to apply to the English Court, at a court hearing (the "Scheme Directions Hearing") to be held on December 2, 2016, for an order (*i.e.*, the Convening Court Order) granting DTEK

---

[13]      A copy of the Practice Statement Letter is attached to the Bastin Declaration as Exhibit F.

EU-DOCS\16262225.13

certain directions in relation to the Scheme, including permission to convene the Scheme Meeting for the purpose of considering and, potentially, approving the Scheme.

63.     On December 2, 2016, the English Court held the Scheme Directions Hearing and issued the Convening Court Order.  The English Court found that it could exercise jurisdiction based, in part, on the fact that the center of the Debtor's main interests is situated in the United Kingdom, based upon the Debtor's connections to the United Kingdom as described above. Among other things, the Convening Court Order set the Scheme Meeting for 10:00 a.m. (London time) on December 19, 2016, at the offices of Latham & Watkins LLP, 99 Bishopsgate, London EC2M 3XF, UK and ordered that a package of documents (an "Information Package") (i) be published on the Scheme Website and that notice be given to the Noteholders via the Clearing Systems that the Information Package is available to be downloaded and viewed and (ii) be made available for inspection during normal business hours at the offices of Latham & Watkins LLP, 99 Bishopsgate, London EC2M 3XF, UK.  The Information Package should include, among other things:

- the Explanatory Statement as required to be provided under English law—*i.e.*, the functional equivalent of a disclosure statement required under section 1125 of the Bankruptcy Code—describing, among other things, the Scheme, the effect and risks of the Scheme, any material interests of the managing directors of DTEK and the effect which the Scheme has on such interests, the Scheme voting and approval process, the other steps of the Restructuring (including a summary of the order sought by this Petition) and information about the Debtor and its business and that of the Group;

- the Scheme;[14]

- a form of notice of the Scheme Meeting (the "Notice of the Scheme Meeting");[15] and

---

[14]     The Scheme is set forth in Part 11 of the Explanatory Statement.  The Explanatory Statement is annexed to the Bastin Declaration as Exhibit G.

[15]     The Notice of the Scheme Meetings is set forth in Appendix 4 of the Explanatory Statement.

24

- voting instructions.[16]

64.     The Convening Court Order also declared that the Petitioner is authorized to act as foreign representative in respect of the UK Proceeding in any chapter 15 proceedings under the Bankruptcy Code.  Bastin Declaration, Ex. A at ¶ 18.

65.     The Information Packages have been provided to the Noteholders on the Scheme Website and the Group's website, together with notification through the Clearing Systems.  The Clearing Systems, in accordance with their usual procedures, have forwarded or will forward a notice confirming their receipt of such materials directly to their participants and clients, being the Account Holders for whom they hold details, and informing the Account Holders of the means by which they can download or otherwise obtain copies of the materials.

66.     The Account Holders have been liaising with the Noteholders and/or any intermediaries who themselves hold an interest in the Existing Notes on behalf of Noteholders, and will collate, through the procedures established by the Clearing Systems for the purposes of the Scheme, individual voting instructions on behalf of the Noteholders.  The votes can then be lodged by the Account Holder with the relevant Clearing System, together with certification of holdings of each of the Noteholders (as of 5:00 p.m. on December 15, 2016), and, in turn, lodged with DTEK via the Information Agent.

67.     It is anticipated that a hearing to consider sanctioning the Scheme, if it obtains requisite approval from the Noteholders at the Scheme Meeting, will occur on December 21, 2016 (the "Sanction Hearing").  After such hearing, the Debtor anticipates the English Court will enter an order sanctioning the Scheme (the "Scheme Sanction Order").

---

[16]     Voting instructions are set forth in Appendix 2 (*Instructions and Guidance for Scheme Creditors and any Person with an Interest in the Notes*) of the Explanatory Statement.  A form of account holder letter (the "Account Holder Letter") to be completed by Noteholders and sent to depositary account holders (the "Account Holders") is set forth in Appendix 3 of the Explanatory Statement.

## H.    Terms of the Restructuring under the Scheme

68.    DTEK proposes to implement the Restructuring through the Scheme to solve a significant part of the immediate and long-term debt problems facing the Group for the benefit of all the Group's stakeholders.  The Restructuring will only be implemented through the Scheme if the Noteholders vote to approve the Scheme by the requisite thresholds and sanctioned by the English Court.

69.    If the Restructuring is implemented via the Scheme, each Noteholder will receive its *pro rata* share of a single new series of notes (the "New Notes") in the total aggregate principal amount of:

(a)    US $894,799,200, *plus*

(b)    all capitalized interest accrued or deferred and unpaid under the Standstill Scheme and interest accrued or deferred and unpaid between October 28, 2016 and the date of the completion of the restructuring of the financial indebtedness of the Group with respect to the holders of the Existing Notes (excluding any default interest, fees, or charges or related interest, fees, or charges of similar effect), which amounts shall be rolled into the New Notes, *plus*

(c)    any amount of indebtedness the Bank Lenders elect to swap under their existing bank facilities up to a maximum aggregate amount of US $300 million in principal amount (plus any interest that has accrued or capitalized prior to the date of such exchange) into additional New Notes at par, as described below.

70.    The key terms of the New Notes are as follows:

(a)    The New Notes will bear interest at the rate of 10.75% per annum with interest paid in cash quarterly and stepped-up in time, starting at 5.5% from the Restructuring Effective Date until December 31, 2018, 6.5% in 2019, 7.5% in 2020, 8.5% in 2021, 9.5% in 2022 and 2023, and 10.75% in 2024.  The amount of interest equal to 10.75% minus the applicable cash payment interest rate for each year will be paid in kind and compounded on a quarterly basis.

EU-DOCS\16262225.13

(b)     The New Notes will mature on December 31, 2024.[17]

(c)     The outstanding principal amount of the New Notes will be due and payable in two instalments as follows: fifty percent on December 29, 2023 and fifty percent on December 31, 2024.

(d)     The existing guarantees and sureties in respect of the Existing Notes will be cancelled and replaced by guarantees and sureties from the same Guarantors and Sureties to secure the New Notes.

(e)     Guarantor DEBV will pledge as security for the New Notes its receivable arising from the intercompany loans from DEBV to DTEK Oil & Gas B.V. (subject to certain conditions).

(f)     The New Notes will be governed by New York law.

71.     During the period commencing on or about the date on which the Explanatory Statement is published and on or around the date falling three (3) days in advance of the date on which the English Court considers whether to sanction to Scheme, any Bank Lender may elect to swap their debt under the Bank Facilities in exchange for New Notes at par up to a maximum aggregate amount of US $300 million.

72.     The Scheme contemplates that the Noteholders will provide releases (the "Releases") of obligations and liabilities of the Released Parties (as defined in Appendix 1 to that certain Deed of Release, which is attached as Schedule 2 to the Explanatory Statement), including, without limitation, DTEK, the Group companies (including the Guarantors and the Sureties), each of their directors, members, officers and representatives, each member of the Steering Committee, and the Debtor's and the Steering Committee's advisors.  Such Releases would be nonconsensual only with respect to those Noteholders who do not vote in favor of the Scheme.

---

[17]     The Noteholders have made a substantial concession to the Debtor in the form of a maturity extension, and in exchange, the Debtor has agreed to pay an increased rate of interest on the New Notes.

27

73.     Although the Group cannot, of course, guarantee (even if the Restructuring is successfully completed) that its business will be successful in the future, DTEK's management and the Board believe that the implementation of the Restructuring is in the best interests of the relevant stakeholders taken as a whole (including the Noteholders), in part because the Debtor will be in a better position to service its debt obligations.

I.      **DTEK's Connections to the United States and the Need for Timely Chapter 15 Relief**

74.     Although DTEK has no place of business in the United States, the Indentures under which it issued the Existing Notes are, by their terms, governed by New York law.[18] DTEK, the Guarantors, and the Sureties have expressly consented to the jurisdiction of the Supreme Court of the State of New York, sitting in New York County, the United States District Court of the Southern District of New York, and/or any appellate court from any thereof (each, a "New York Court").[19] The Debtor and each Guarantor and Surety has appointed Law Debenture Corporate Services Inc., 400 Madison Avenue, Suite 4D, New York, New York 10017, as its agent for service of process in actions arising out of the Indentures or transactions contemplated thereby.[20] As noted, DTEK also has an interest in funds on deposit in the Bank Account in New York. Moreover, some of the Noteholders are based in the United States.

75.     The purpose of seeking recognition in the United States is to ensure the enforceability and effectiveness of the Scheme in the United States and to prevent any dissident creditors from bypassing the effect of the Scheme by commencing litigation or taking other

---

[18]     *See* Bastin Declaration, Ex. B, § 12.05(a); Bastin Declaration, Ex. C, § 12.05(a).

[19]     Pursuant to Section 12.05 of the Indentures, disputes arising out of or relating to the Indentures or the Existing Notes are, in the first instance, subject to arbitration in accordance with the rules of arbitration of the London Court of International Arbitration; however, the indenture trustees may, in their sole discretion, elect that any dispute be brought and heard in a New York Court.

[20]     *See* Bastin Declaration, Ex. B, §12.05(d); Bastin Declaration, Ex. C, §12.05(d).

actions in the United States to obtain a greater recovery than other, similarly-situated creditors. In addition, recognition of the Scheme would guard the Debtor and its affiliates against the cost and potential disruption to the Restructuring caused by enforcement action by dissenting creditors. Accordingly, the Term Sheet for the Restructuring provides for the Debtor to seek chapter 15 recognition of the Scheme. Furthermore, the Debtor has notified the English Court that it would be seeking chapter 15 recognition of the Scheme, and the English Court is expecting the Debtor to do so.

76.    The Scheme, once sanctioned, will prohibit Scheme Creditors (as defined in the Scheme) from commencing or continuing (or instructing, directing, or authorizing any other person to commence or continue) any Proceedings Claim (as defined in the Scheme) in respect of, arising from or relating to a Scheme Claim (as defined in the Scheme) after the Scheme Effective Date (which is expected to be on or around December 21, 2016). Furthermore, in connection with the issuance of the New Notes, the Noteholders will release the Debtor, the Guarantors, and the Sureties (among others), from all obligations under the Existing Notes. Recognition by this Court is crucial to carrying out the Restructuring contemplated by the Scheme because it forecloses the opportunity for dissenting Noteholders to circumvent the terms of the Scheme and the New Notes. Absent the relief requested herein, Noteholders in the United States may be free to take enforcement action against the Debtor, including action to accelerate the amounts due under the Indentures and/or to call upon the guarantees and/or sureties related to the Existing Notes. Indeed, creditors have, in the past, threatened the Group with enforcement proceedings in the United States, and the Debtor does not want to be beholden to similar hold out tactics in connection with effectuating the Restructuring. Thus, the Petitioner respectfully requests that this Court grant the relief requested with all available expediency.

EU-DOCS\16262225.13

## JURISDICTION AND VENUE

77.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)

and 1334 and the Amended Standing Order of Reference, dated January 31, 2012, Reference M-

431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012)

(Preska, C.J.).

78.     This case has been properly commenced pursuant to section 1504 of the

Bankruptcy Code by the filing of the Petition for recognition of the UK Proceeding under section

1515 of the Bankruptcy Code.

79.     Venue is proper in this district.  Section 1410 of title 28 of the United States Code

provides as follows:

> A case under chapter 15 of title 11 may be commenced in the district court of the
> United States for the district—
>
> (1)     in which the debtor has its principal place of business or principal
> assets in the United States;
>
> (2)     if the debtor does not have a place of business or assets in the
> United States, in which there is pending against the debtor an action or
> proceeding in a Federal or State court; or
>
> (3)     in a case other than those specified in paragraph (1) or (2), in
> which venue will be consistent with the interests of justice and the
> convenience of the parties, having regard to the relief sought by the
> foreign representative.

80.     The Indentures governing the Existing Notes that are the subject of the

Restructuring are governed by New York law, and the Debtor's only assets in the United States

are located in this district.

30

## RELIEF REQUESTED

81.     The Petitioner requests that this Court enter an order, substantially in the form of

the proposed order attached hereto as <u>Exhibit A</u>, pursuant to sections 105(a), 1507(a),

1509(b)(2)-(3), 1515, 1517, 1520, 1521(a), and 1525(a) of the Bankruptcy Code that:[21]

>   (a)     recognizes the UK Proceeding as a foreign main proceeding (as defined in
>   section 1502 of the Bankruptcy Code) and grants the Debtor all of the
>   relief afforded to foreign main proceedings pursuant to section 1520(a) of
>   the Bankruptcy Code;
>
>   (b)     recognizes the Petitioner as a "foreign representative" as defined in section
>   101(24) of the Bankruptcy Code in respect of the UK Proceeding;
>
>   (c)     grants the Petitioner authority to examine witnesses, take evidence, and
>   deliver information concerning the Debtor and its business, and entrusts
>   the administration of any and all of the Debtor's assets within the
>   territorial jurisdiction of the United States to the Petitioner;
>
>   (d)     provides that, as of the date hereof, the Scheme Sanction Order and the
>   Scheme are recognized, granted comity, entitled to full force and effect
>   against all entities (as that term is defined in section 101(15) of the
>   Bankruptcy Code) in accordance with their terms, and that such terms
>   shall be binding and fully enforceable on the Noteholders, as well as their
>   respective heirs, successors, assigns, trustees, subsidiaries, affiliates,
>   officers, directors, agents, employees, representatives, attorneys,
>   beneficiaries, guardians and similar officers, or any persons claiming
>   through or in the right of any such persons or entities (collectively,
>   the "<u>Related Parties</u>") whether or not they actually agreed to be bound by
>   the Scheme or participated in the UK Proceeding;
>
>   (e)     provides that, as of the Scheme Settlement Date, the New Notes
>   Documents are entitled to full force and effect against all entities (as that
>   term is defined in section 101(15) of the Bankruptcy Code) in accordance
>   with their terms, and that such terms shall be binding and fully enforceable
>   on, in the event of the Restructuring, the Noteholders and Related Parties,
>   whether or not they actually agreed to be bound by the Scheme or
>   participated in the UK Proceeding;
>
>   (f)     provides that, as of the Scheme Settlement Date, any judgment, wherever
>   and whenever obtained, to the extent such judgment is a determination of
>   the personal liability of the Debtor or any Released Party with respect to
>   any debt cancelled, discharged, or restructured under the Scheme

---

[21]     Terms not defined herein shall have the meanings ascribed to them in the Scheme.

(including, for the avoidance of doubt, any amount owed in connection with the Existing Notes) and/or as a result of English law relating to the Restructuring is unenforceable within the territorial jurisdiction of the United States;

(g)     as of the Scheme Settlement Date, permanently enjoins all Noteholders and Related Parties from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit, or other proceeding (including, without limitation, arbitration, mediation, or any judicial, quasi-judicial, or administrative action, proceeding, or process whatever in any judicial, arbitral, administrative, or other forum), employing any process, or performing any act within the territorial jurisdiction of the United States to collect, recover, or offset (except as expressly provided in the Scheme and the New Notes Documents) any debt or claim cancelled, discharged, or restructured under the Scheme (including, for the avoidance of doubt, any amount owed in connection with the Existing Notes) and/or as a result of English law relating to the Restructuring, or seeking any discovery related thereto;

(h)     as of the Scheme Settlement Date, permanently enjoins all Noteholders and Related Parties from commencing or continuing any action (including, without limitation, arbitration, mediation, or any judicial, quasi-judicial, or administrative action or proceeding or process whatever in any judicial, arbitral, administrative, or other forum), including by way of counterclaim, employing any process, or performing any act to collect, recover, or offset (except as expressly provided in the Scheme and the New Notes Documents) any debt or claim cancelled, discharged, or restructured under the Scheme (including, for the avoidance of doubt, any amount owed in connection with the Existing Notes) and/or as a result of English law relating to the Restructuring against property of the Debtor or of the Released Parties within the territorial jurisdiction of the United States, including (i) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judicial, quasi-judicial, or administrative judgment, award, determination, decree, assessment, garnishment, or order, against the Debtor or the Released Parties or their respective property, or any direct or indirect transferee of or successor to any property of the Debtor or of the Released Parties, or any property of such transferee or successor, or (ii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien or encumbrance of any kind against such property;

(i)     as of the Scheme Settlement Date, permanently enjoins all Noteholders and Related Parties from (i) transferring, relinquishing, or disposing of any property of the Debtor or of the Released Parties located within the territorial jurisdiction of the United States, or (ii) taking or continuing any act to obtain possession of, commingle, or exercise control over, such

EU-DOCS\16262225.13

property located within the territorial jurisdiction of the United States, to the extent any such act under (i) or (ii) is inconsistent with the Scheme, the New Notes Documents, and English law relating to the Restructuring;

(j)     as of the Scheme Settlement Date, permanently enjoins all entities (as that term is defined in section 101(15) of the Bankruptcy Code) subject to the Court's jurisdiction from taking any action inconsistent with the Scheme, including, without limitation, against the Debtor, the Released Parties, or against any property of the Debtor or the Released Parties within the territorial jurisdiction of the United States;

(k)     permanently enjoins the commencement of any suit, action, or proceeding in the territorial jurisdiction of the United States to settle any dispute which arises out of any provision of the Scheme and English law relating to the Restructuring;

(l)     as of the Scheme Settlement Date, permanently enjoins all Noteholders and Related Parties from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit, or other proceeding (including, without limitation, arbitration, mediation, or any judicial, quasi-judicial, or administrative action, proceeding, or process whatever in any judicial, arbitral, administrative, or other forum), or employing any process within the territorial jurisdiction of the United States, against the Foreign Representative (personally or in such capacity), the Debtor, the Released Parties, or any of their respective successors, assigns, agents, representatives, advisors, or attorneys (collectively, the "Debtor Parties") or any of them in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken by any of the Debtor Parties in connection with this Chapter 15 Case or in preparing, disseminating, applying for, or implementing the Scheme or the Scheme Sanction Order;

(m)     provides that no action taken by the Petitioner in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Scheme, any order entered in respect of the Petition, the Chapter 15 Case, any further order for additional relief in the Chapter 15 Case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any protections afforded the Petitioner as Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code;

(n)     provides that, for the avoidance of doubt, nothing in the Order shall impair the rights of any entity granted under the Scheme or the New Notes Documents, having regard in particular to the exclusive right of the Courts of England & Wales to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the Explanatory Statement or any provision of the Scheme, or out of any action taken or omitted to be

taken under the Scheme or in connection with the administration of the
Scheme;

(o)      provides that this Court shall retain jurisdiction with respect to the effect,
enforcement, amendment or modification of any such order issued by this
Court; and

(p)      provides such other and further relief as the Court deems proper and just
(collectively, the "<u>Relief Requested</u>").

## BASES FOR RELIEF

82.      The Relief Requested is based on the provisions of chapter 15 and certain other
provisions of the Bankruptcy Code discussed in detail below.  The purpose of chapter 15 is to
"incorporate the Model Law on Cross-Border Insolvency (the "<u>Model Law</u>") promulgated by the
United Nations Commission on International Trade Law ("<u>UNCITRAL</u>") so as to provide
effective mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501(a).
Thus, "[t]he language of chapter 15 tracks the Model Law, with adaptations designed to mesh
with United States law.  Congress prescribed a rule of interpretation that expressly requires
United States courts to take into account the statute's international origin and to promote
applications of chapter 15 that are consistent with versions of the Model Law adopted in other
jurisdictions."  *In re Pro-Fit Int'l Ltd.*, 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008); *see also In re
British Am. Ins. Co.*, 425 B.R. 884, 899 (Bankr. S.D. Fla. 2010) ("Chapter 15 represents a nearly
verbatim enactment of the Model Law").  Accordingly, in interpreting chapter 15, a court is to
"consider its international origin, and the need to promote an application of [chapter 15] that is
consistent with the application of similar statutes adopted by foreign jurisdictions."  11 U.S.C. §
1508.[22]

---

[22]      The legislative history notes that "interpretation of [chapter 15] on a uniform basis will be aided by
reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen.
Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) (the "<u>Guide</u>")] and the Reports cited therein, which

EU-DOCS\16262225.13

83.     DTEK is eligible to be a debtor under chapter 15 of the Bankruptcy Code and has

property in the United States in this district in accordance with section 109(a) of the Bankruptcy

Code.  *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238,

247 (2d Cir. 2013) ("The debtor that is the subject of the foreign proceeding, therefore, must

meet the requirements of Section 109(a) before a bankruptcy court may grant recognition of the

foreign proceeding."); *In re Barnet*, 2014 WL 2805264, at *8 (Bankr. S.D.N.Y. June 19, 2014)

(holding cash in client trust account maintained by the foreign representatives' U.S. counsel

satisfied the section 109(a) requirement); *see also In re Yukos Oil Co.*, 321 B.R. 396, 407 (Bankr.

S.D. Tex. 2005) (finding that debtor met 109(a) requirement through deposits in Texas bank in

name of affiliate); *In re Global Ocean Carriers, Ltd.*, 251 B.R. 31, 38-39 (Bankr. D. Del. 2000)

(finding that bank accounts constituted property in the United States despite containing minimal

funds, and that interest in bankruptcy counsel retainer held in escrow also constituted sufficient

property in the United States for Chapter 15 eligibility); *In re McTague*, 198 B.R. 428, 431

(Bankr. W.D.N.Y. 1996) (finding that debtor met 109(a) requirement "solely on the basis of

having a dollar, a dime or a peppercorn located in the United States").  Moreover, DTEK is

entitled to recognition of the UK Proceeding as the foreign main proceeding and all of the other

relief request under chapter 15, as outlined below.

**A.      The Court Should Grant Recognition of the UK Proceeding as a Foreign Main
        Proceeding and of the Petitioner as its Foreign Representative**

84.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing,

the court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if

(1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of

the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body

---

explain the reasons for the terms used and often cite their origins as well."  H. Rep. No. 109-31, Pt. 1, 109th Cong.,
1st Sess. 109-110 (2005).

and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code. *See In re Overnight & Control Comm'n of Avanzit, S.A.*, 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008). While the foreign representative has the burden of establishing recognition, a decision or certificate of a foreign court recognizing the foreign proceeding or foreign representative creates a rebuttable presumption that the foreign proceeding and foreign representative can be recognized. *Id.* As explained below, the UK Proceeding, the Petitioner, and this Petition satisfy all of the foregoing requirements.

(i)     **The UK Proceeding is a Foreign Main Proceeding**

85.     The UK Proceeding is a foreign main proceeding and, as such, satisfies the first condition for the entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.

86.     As an initial matter, the UK Proceeding comes within the general definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code.[23] Section 101(23) requires that a "foreign proceeding" (1) be a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court, and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. *See* 11 U.S.C. § 101(23). The statute defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." *See* 11 U.S.C. § 1502(3).

87.     There should be little doubt that the UK Proceeding qualifies as a "foreign proceeding" under section 101(23). Section 1516(a) of the Bankruptcy Code entitles this Court

---

[23]     Section 101(23) of the Bankruptcy Code provides that "[t]he term 'foreign proceeding' means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).

to presume that a foreign proceeding is a "foreign proceeding," if the decision commencing the foreign proceeding so indicates. *See* 11 U.S.C. §§ 1516(a), 1515(b)(1). Here, the English Court has recognized that the Petitioner "is authorised on behalf of the Scheme Company to act as a foreign representative . . . of the Scheme Company in any Chapter 15 Proceedings in the United States Bankruptcy Court." Bastin Declaration, Ex. A at ¶ 18. Further, the English Court declared:

> [The Petitioner] is authorised on behalf of the Scheme Company [*i.e.*, the Debtor] to take any and all actions to execute, deliver, certify, file, and/or record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, or certificates, and to take any and all steps deemed by the Foreign Representative to be necessary or desirable to carry out the purpose and intent of the Scheme including, for the avoidance of doubt, filing any petition or other request for relief intended to be filed under Chapter 15 of the US Bankruptcy Code, to the extent required.

*Id.* at ¶ 19. The English Court presupposed that the UK Proceeding is of the kind encompassed by the section 101(23) definition of "foreign proceeding," which is based on the definition set forth in Article 2(a) of the Model Law (adopted by the United Kingdom); otherwise it would not have authorized the Petitioner to file this Chapter 15 Case.

88.    The UK Proceeding is "collective" because it directly involves all Noteholders and requires approval by a majority in number of the voting Noteholders representing at least three-quarters in amount of the claims voted in order for the Restructuring to proceed. The Scheme is intended to benefit all Noteholders collectively, rather than to benefit any single Noteholder alone.

89.    The UK Proceeding is a judicial proceeding in that it required the Convening Court Order to commence and will require the Scheme Sanction Order for the Scheme to be

37

ultimately approved, each issued by the English Court, a judicial body of the United Kingdom, which, under the Scheme, will have exclusive jurisdiction to hear and determine any suit, action, or Proceeding (as defined in the Scheme) and to settle any dispute which arises out of or in connection with the terms of the Scheme or its implementation or out of any action taken or omitted to be taken under the Scheme or in connection with the administration of the Scheme and for such purposes the Scheme Creditors irrevocably submitted to the jurisdiction of the English Court.  Scheme at ¶ 34.  Thus, the English Court will supervise the affairs of the Debtor in connection with the Scheme.

90.    The UK Proceeding is pending in a foreign country, England (a constituent member of the political union comprising the United Kingdom), under a law relating to adjustment of debt (*i.e.*, Part 26 of the Companies Act 2006), for the purpose of reorganization. Here, the exchange of claims against the Debtor under the Existing Notes for New Notes is a restructuring scenario often implemented in chapter 11 cases familiar to this Court.

91.    The Scheme proposed in this case restructures claims and is therefore for the "adjustment of debt."  At its eighteenth session, the UNCITRAL Working Group on Insolvency Law, which oversaw the drafting of the Model Law, indicated that the term "foreign proceeding" was meant to include scheme and composition proceedings such as the UK Proceeding:

> The proposal was made to add to [the definition of "foreign proceeding"] a reference to composition proceedings, namely, *proceedings in which indebtedness was reduced while the debtor remained in control of its assets*.  The Working Group hesitated to add such a specific reference to composition proceedings.  One view in that direction was that the broad category of "reorganization", which might be read more as an economic than as a legal term, would widely be understood as encompassing composition and other such proceedings.  It was felt that adding such a specific reference to any particular form of reorganization might actually create uncertainty.  Furthermore, it was observed that attempting a list of reorganization proceedings would run the

38

> risk of excluding some types of proceedings intended to be
> covered. *While it was generally agreed that composition
> proceedings should be covered*, the Working Group was not ready
> to reach a definitive decision on how best to achieve that result and
> deferred consideration of the matter to a later stage of its work.

U.N. G.A., United Nations Comm'n on Int'l Trade L., 29th Sess., Rep. of Working Grp. on

Insolvency Law on the Work of the Eighteenth Sess. ¶ 108 (1 December 1995) ("A/CN.9/419")

(emphasis added).

92.    The Bankruptcy Code definition of "foreign proceeding" is even clearer in that it

adds the phrase "or adjustment of debt" to the words "under a law related to insolvency."  11

U.S.C. § 101(23).  The legislative history indicates that the change is to emphasize "that the

scope of the Model Law and chapter 15 is not limited to proceedings involving only debtors

which are technically insolvent, but broadly includes all proceedings involving debtors in severe

financial distress, so long as those proceedings also meet the other criteria of section 101(24)

[sic]."  H. Rep. 109-31, Pt. 1, 109th Cong., 1st Sess. 118 (2005).

93.    Accordingly, schemes under English law have routinely been recognized as

foreign proceedings in chapter 15 cases by this Court.  *See, e.g., In re Towergate Finance, plc,*

Case No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015); *In re New World Resources N.V.*,

Case No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014); *In re Zlomrex International Finance*

*S.A.*, No. 13-14138 (Bankr. S.D.N.Y. Jan. 31, 2014); *In re Magyar Telecom B.V.*, No 13-13508

(Bankr. S.D.N.Y. Dec. 11, 2013); *In re Tokio Marine Europe Insurance Ltd.*, No. 11-13420

(MG) (Bankr. S.D.N.Y. Sept. 08, 2011); *Highlands Ins. Co.* (U.K.), No. 07-13970 (MG) (Bankr.

S.D.N.Y. Aug. 18, 2009); *In re Castle Holdco 4, Ltd.*, No. 09-11761 (REG) (Bankr. S.D.N.Y.

May 7, 2009).

94.    In addition to qualifying as a "foreign proceeding" under section 101(23), the UK

Proceeding qualifies as a "foreign main proceeding," which is defined in the Bankruptcy Code as

"a foreign proceeding pending in the country where the debtor has the center of its main interests." *See* 11 U.S.C. § 1502(4); *see also* 11 U.S.C. § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered if the foreign proceeding that is subject to the petition "is pending in the country where the debtor has the center of its main interests").

95.    The relevant time period to consider in determining the location of a debtor's "center of main interests" ("COMI") is the date on which the chapter 15 petition was filed, though "a court may consider the period between the commencement of the foreign proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith." *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013).

96.    The Bankruptcy Code neither defines nor provides a conclusive test for determining the location of a debtor's COMI.  It does provide, however, that "in absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests."  11 U.S.C. §1516(c).  If the presumption is rebutted, then determining a corporate debtor's COMI becomes a fact-intensive analysis, considering factors such as: (1) the location of the debtor's headquarters; (2) the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); (3) the location of the debtor's primary assets; and (4) the jurisdiction of the creditors.  *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416 (Bankr. S.D.N.Y. 2014) (citing *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013)).  Courts have held COMI "generally equates with the concept of 'principal place of business' in the United States."  *In re Millenium Global Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 72 (Bankr. S.D.N.Y. 2011) (quoting *In re Tri-Continental*

40

*Exchange Ltd.*, 349 B.R. 627, 634 (E.D. Cal. 2006)); *see also In re Basis Yield Alpha Fund*

*(Master)*, 381 B.R. 37, 48 (Bankr. S.D.N.Y. 2008) (using COMI and "principal place of

business" interchangeably).

97.    DTEK's COMI is in the United Kingdom based on the statutory presumption

under section 1516(c) of the Bankruptcy Code because it is incorporated in England and Wales.

In this case, the presumption is not rebutted and is, in fact, confirmed by the Debtor's footprint:

(i) the Debtor's registered office is in London, (ii) the Debtor pays taxes in the United Kingdom,

(iii) the Debtor's corporate director, which undertakes the day-to-day management of the Debtor,

has its registered office in the United Kingdom, and (iv) the Debtor's secretary is based in

London.   In addition, DTEK's primary financial advisor, Rothschild, and its primary legal

advisor, Latham & Watkins LLP, work on its matters primarily from London.   Finally, the

English Court accepted jurisdiction, in part, on the basis that the center of the Debtor's main

interests is in the United Kingdom.

98.    For all of the reasons set forth above, the UK Proceeding is, and should be

recognized as, the foreign main proceeding in respect of the Debtor.

99.    If the UK Proceeding is not recognized as the foreign main proceeding of the

Debtor (which the Debtor believes it should), it should be recognized as a "foreign nonmain

proceeding" pursuant to section 1517(b) of the Bankruptcy Code, which provides that a foreign

proceeding shall be recognized as a foreign nonmain proceeding if it is pending in a country

where the debtor has an establishment.  11 U.S.C. § 1517(b)(2).  An "establishment" is defined

as "any place of operations where the debtor carries out a nontransitory economic activity."  11

U.S.C. § 1502(2).  While the term "nontransitory activity" is not defined in the Bankruptcy

Code, courts have interpreted it to mean "a local place of business."  *In re Bear Stearns High-*

41

*Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 131 (Bankr. S.D.N.Y. 2007), *aff'd* 389 B.R. 325 (S.D.N.Y. 2008).  For the various reasons described above in support of the United Kingdom as the Debtor's COMI, including, most notably, that the Debtor's governance is directed from the United Kingdom, it is clear that the Debtor has an "establishment" in the United Kingdom.  If recognition is granted as a foreign nonmain proceeding, this Petition shall constitute a request for the Court to exercise its discretion under section 1521 to grant the relief requested herein.  *See In re SPhinX, LTD.*, 351 B.R. 103, 115 (Bankr. S.D.N.Y. 2006) (acknowledging the court's "power to grant, under appropriate circumstances, extensive relief whether the foreign proceeding is recognized as "main" or "nonmain"); *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1026 (5th Cir. 2010) (holding that a foreign nonmain proceeding may provide the same relief as recognition as a foreign main proceeding).

### (ii)     The Petitioner Meets the Requirements of a Foreign Representative

100.     The second requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a person or body.  *See* 11 U.S.C. § 1517(a)(2).

101.     The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).  Under section 101(41) of the Bankruptcy Code, the "term 'person' includes [an] individual[.]"  11 U.S.C. § 101(41).

102.    The Petitioner in this case is an individual who has been (1) duly appointed by the Debtor's board as foreign representative of the UK Proceeding and (2) declared as authorized to act as "foreign representative" pursuant to the Convening Court Order.   Bastin Declaration, Ex. A at ¶ 18.  As such, the Petitioner satisfies the second requirement for the entry of an order recognizing the UK Proceeding under section 1517(a) of the Bankruptcy Code.

### (iii)    The Petition Meets the Requirements of Section 1515

103.    The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a)(3).  Section 1515 of the Bankruptcy Code sets forth the following:

> (a)    A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.
>
> (b)    A petition for recognition shall be accompanied by—
>
> > (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
> >
> > (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
> >
> > (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.
>
> (c)    A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.
>
> (d)    The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

EU-DOCS\16262225.13

104.     Here, all of the requirements have been met.  First, the Chapter 15 Case was duly and properly commenced by the Petitioner through the filing of this Petition as required by section 1515(a) of the Bankruptcy Code.

105.     Second, evidence of the existence of the UK Proceeding and the appointment of the Petitioner as foreign representative thereof have been provided to the Court as required under section 1515(b)(1) and (d) of the Bankruptcy Code.  *See* Exhibit A to the Bastin Declaration (the Convening Court Order).

106.     Third, in accordance with section 1515(c) of the Bankruptcy Code, the attachment to the Petition contains a statement identifying the UK Proceeding as the only foreign proceeding currently pending with respect to the Debtor.

107.     For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and, thus, that the entry of an order recognizing the UK Proceeding as a foreign main proceeding is proper.

**B.      The Debtor Is Entitled to the Automatic Relief Under 11 U.S.C. § 1520**

108.     Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding, including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property located within the territorial jurisdiction of the United States.  *See* 11 U.S.C. § 1520(a).  Given that the protections set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding under section 1517, the Petitioner respectfully submits that no further showing is required to the extent the Court recognizes the UK Proceeding as a foreign main proceeding.

EU-DOCS\16262225.13

C.      **The Discretionary Relief Requested Is Necessary and Appropriate to Effect the Restructuring and Should Be Granted**

109.    Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). Such relief may "include" the following:[24]

> (1)     staying the commencement or continuation of actions or proceedings concerning the debtor's assets, rights, obligations, or liabilities to the extent they have not been stayed under section 1520(a);

> (2)     staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

> (3)     suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) . . . ; and

> (7)     granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

*Id.* The Court may grant relief under section 1521(a) if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

110.    In granting discretionary relief, the court may also act pursuant to section 1507 to provide "additional assistance" to a foreign representative under the Bankruptcy Code or other U.S. law. *See* 11 U.S.C. § 1507(a). The legislative history to section 1507 states that the section provides authority for "additional relief" beyond that permitted under sections 1519 to 1521.[25] In exercising discretion to grant relief under section 1507, courts will be guided by the standards set forth in section 1507. Section 1507(b) provides that:

> In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

---

[24]     Under the Bankruptcy Code, the term "including" is not limiting. *See* 11 U.S.C. § 102(3).

[25]     H.R. Rep. No. 109-31, pt. I, 109th Cong., 1st Sess. 109 (2005).

EU-DOCS\16262225.13

(1)     just treatment of all holders of claims against or interests in the debtor's property;

(2)     protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3)     prevention of preferential or fraudulent dispositions of property of the debtor;

(4)     distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5)     if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

111.    Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

112.    As described above, the purpose of chapter 15 is to incorporate the Model Law into the United States bankruptcy law.  Chapter 15 is designed to provide effective mechanisms for dealing with cross-border insolvency cases with the objectives of:

(1)     cooperation between—

(A)     courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and

(B)     the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

(2)     greater legal certainty for trade and investment;

(3)     fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

(4)     protection and maximization of the value of the debtor's assets; and

(5)     facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501(a).  "Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee."  11 U.S.C. § 1525(a); *see also* 11 U.S.C. § 1509(b)(3) (once recognition of a foreign proceeding is granted, "a court in the United States shall grant comity or cooperation to the foreign representative");[26] *In re Toft*, 453 B.R. 186, 190 (Bankr. S.D.N.Y. 2011) (quoting section 1509).

113.    For the reasons that follow, the Petitioner requests this Court to exercise its discretion under sections 105, 1507, and 1521 to grant the remaining Relief Requested.

### (i)    The Discretionary Relief Requested Is Appropriate under Section 1521

114.    The remaining portion of the Relief Requested is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code.  If granted, such relief would promote all of the legislatively enumerated objectives of section 1501(a).

115.    Fair and efficient administration of the Restructuring requires that all Noteholders be bound by the terms of the Scheme and other New Notes Documents as approved and made effective by the English Court and the laws of England and Wales.  *See Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign proceeding enables the assets of a debtor to be dispersed in an equitable, orderly and systematic manner, rather than in a haphazard, erratic or piecemeal fashion.").  Indeed, the Supreme Court

---

[26]    The term "cooperation" appears to be even broader than the term "comity."  *See Ad Hoc Grp. of Vitro Noteholders v. Vitro SAB de CV (In re Vitro SAB de CV)*, 701 F.3d 1031, 1047 (5th Cir. 2012 ), *cert. denied sub nom. Vitro, S.A.B. de C.V. v. Ad Hoc Group of Vitro Noteholders*, 133 S.Ct. 1862 (2013) (Mem) ("Although use of the word 'comity' connotes recognition of another judicial proceeding, the word 'cooperation' suggests a much broader meaning.").

recognized the necessity of giving effect to foreign schemes of arrangement in order to further

these goals, reasoning that:

> [u]nless all parties in interest, wherever they reside, can be bound
> by the arrangement which it is sought to have legalized, the
> scheme may fail.  All home creditors can be bound.  What is
> needed is to bind those who are abroad.   Under these
> circumstances the true spirit of international comity requires that
> schemes of this character, legalized at home, should be recognized
> in other countries.

*Canada S. Ry. Co. v. Gebhard*, 109 U S. 527, 539 (1883) (giving effect to a Canadian scheme of

arrangement).

116.    Here, it is possible that certain Noteholders or other entities may seek to obtain

judgments in the United States against the Debtor, the Guarantors, the Sureties, or others

involved in the Restructuring as effected by the Scheme and the New Notes Documents in order

to obtain more than the *pro rata* treatment to which they are entitled pursuant to the terms of the

Scheme.  If such entities can effectively evade the terms of the Scheme and the New Notes

Documents by commencing actions in the United States, the Debtor, the Guarantors, the

Sureties, or others involved in the Restructuring would be required to defend such proceedings,

which would in turn deplete the resources of the restructured business and prejudice its

reorganized value.  The Relief Requested is required to prevent individual creditors from acting

to frustrate the purposes of the Scheme, the foremost of which is the fair and efficient

administration of the Restructuring in order to maximize value for all creditors.

### (ii)    The Discretionary Relief Requested Meets the Standards for Injunctive Relief

117.    To the extent the standards for injunctive relief apply in this Chapter 15 Case to

the Relief Requested, those standards are met.   Permanent injunctive relief generally is

appropriate where the movant can show a likelihood of irreparable harm.  Irreparable harm to an

EU-DOCS\16262225.13

estate exists where the orderly determination of claims and the fair distribution of assets are

disrupted. *See Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713-14 (2d Cir.

1987) ("The equitable and orderly distribution of a debtor's property requires assembling all

claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan

of reorganization would fail."); *see also In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y.

2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the

orderly reconciliation of claims and fair distribution of assets in a single, centralized forum")

(quoting Collier on Bankruptcy ¶ 304.05, at 304-21 (15th ed. Rev. 2003)); *In re Petition of

Brierley*, 145 B.R. 151, 168 (Bankr. S.D.N.Y. 1992) ("Harm to the estate exists from the failure

to grant injunctive relief in the form of disruption of an orderly determination of claims and the

fair distribution in a single case.") (internal quotation marks and citation omitted).

118.    The Supreme Court, the Court of Appeals for the Second Circuit, and several

courts in this district have recognized a federal court's authority to grant permanent injunctive

relief to enforce foreign plans and discharges. *See, e.g., Can. S. Ry. Co. v. Gebhard*, 109 U.S. at

539 (concluding that actions brought in the United States by plaintiff bondholders who did not

participate in the Canadian insolvency proceedings of the bond issuer could not be maintained,

even though the bonds were payable in New York); *The Argo Fund Ltd. v. Bd. of Dirs. of

Telecom Arg., S.A., as Foreign Rep. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg.,

S.A.)*, 528 F.3d 162, 174-75 (2d Cir. 2008) (concluding that bankruptcy court did not abuse its

discretion in granting full force and effect to Argentine plan and approval order in the United

States); *In re Sino-Forest Corp.*, 501 B.R. 655, 666 (Bankr. S.D.N.Y. November 25, 2013)

(recognizing, enforcing, and granting permanent injunctive relief in chapter 15 case in respect of

foreign plan that included protection for third party releases in Canadian plan); *In re Metcalfe &*

*Mansfield Alt. Invs.*, 421 B.R. 685, 700 (Bankr. S.D.N.Y. 2010) (same); *In re Petition of Ho Seok Lee*, 348 B.R. 799, 803 (Bankr. W.D. Wash 2006) (holding that an adversary proceeding is not required to seek permanent injunctive relief under chapter 15); *see also Oui Fin. LLC v. Dellar*, No. 12-cv-07744-RA, 2013 WL 5568732, (S.D.N.Y. Oct. 9, 2013) (applying doctrine of comity under New York law to dismiss complaint seeking payment from debtor and nondebtor guarantor in contravention of restructuring plan approved in French *procedure de sauvegarde).*

119.    Moreover, such injunctive relief has been granted in many chapter 15 cases without reported decisions.  *See, e.g., In re Towergate Finance, plc,* Case No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015) (granting recognition and giving full force and effect to a UK scheme of arrangement); *In re New World Resources N.V.*, Case No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014) (same); *In re Zlomrex International Finance S.A.*, No. 13-14138 (Bankr. S.D.N.Y. Jan. 31, 2014) (same); *In re Magyar Telecom B.V.*, No 13-13508 (Bankr. S.D.N.Y. Dec. 11, 2013) (same); *In re "BTA Bank" JSC*, No. 12-13081 (Bankr. S.D.N.Y. Jan. 3, 2013); *In re JSC BTA Bank*, No. 1010638, (Bankr. S.D.N.Y. Jan. 6, 2011); *In re Hellas Telecom. (Luxembourg) V*, No. 10-13651 (Bankr. D. Del. Dec. 13, 2010) (same); *Highlands Insurance Co. (U.K.) Limited*, No. 07-13970 (MG) (Bankr. S.D.N.Y. Aug. 18, 2009).

120.    If the Restructuring, as contemplated by the Scheme and the New Notes Documents, is not given effect in the United States, there is a risk that dissident Noteholders could bring proceedings in the United States against the Debtor, the Guarantors, the Sureties, and/or other parties protected by the Scheme and the New Notes Documents based upon Section 12.05 in the Indentures.  In the absence of recognition by this Court of the Scheme and the Restructuring, the continued uncertainty and threat of adverse action by Noteholders intent on

50

disrupting the Restructuring to extract financial concessions will be harmful to the Debtor, its

creditors, and the communities it serves.

> **(iii)   Granting the Discretionary Relief Requested Will Leave Creditors and Other Parties in Interest "Sufficiently Protected" and Will Not Be "Manifestly Contrary to the Public Policy of the United States"**

121.    The Relief Requested under section 1521 is designed to promote the goals of

chapter 15.  *See* 11 U.S.C. § 1525(a) ("Consistent with section 1501, the court shall cooperate to

the maximum extent possible with a foreign court or a foreign representative, either directly or

through the trustee.").   As shown above, such relief is "appropriate" as that term is used in

section 1521 because it is necessary to ensure the success of the UK Proceeding, the Scheme,

and the Restructuring.   However, the Court may grant such relief only if the interests of "the

creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C.

§ 1522(a) (adopting Article 22 of the Model Law).

122.    The Bankruptcy Code does not define "sufficient protection."   The legislative

history indicates that the prohibition was meant to apply "if it is shown that the foreign

proceeding is seriously and unjustifiably injuring United States creditors."  H. Rep. No. 109-31,

pt. 1, 109th Cong., 1st Sess. 116 (2005).  A determination of sufficient protection "requires a

balancing of the respective parties' interests."   *In re AJW Offshore, Ltd.*, 488 B.R. 551, 559

(Bankr. E.D.N.Y. 2013); *see also Tri-Cont'l Exch.*, 349 B.R. at 637 ("Standards that inform the

analysis of § 1522 protective measures in connection with discretionary relief emphasize the

need to tailor relief and conditions so as to balance the relief granted to the foreign representative

and the interests of those affected by such relief, without unduly favoring one group of creditors

over another."); Guide  ¶ 161 ("The idea underlying article 22 is that there should be a balance

between relief that may be granted to the foreign representative and the interests of the persons

that may be affected by such relief.  This balance is essential to achieve the objectives of cross-

border insolvency legislation."). Section 1522 "gives the bankruptcy court broad latitude to mold relief to meet specific circumstances." *Int'l Banking*, 439 B.R. at 626-27 (internal quotations and citations omitted); *Atlas Shipping*, 404 B.R. at 740; *see also In re Artimm*, 278 B.R. 832, 837 (Bankr. C.D. Cal. 2002) (Section 304 "discretion typically points in favor of granting relief to section 304 petitioners," and "section 304 gives a court wide latitude to mold appropriate relief so that a foreign insolvency can proceed in a rational fashion with due regard for all of the varied and competing interests at issue.").

123.    All Noteholders are "sufficiently protected" by the treatment afforded them by the Scheme and the process by which it will be approved because all Noteholders will be treated the same (with the exception of the payment of the Lock-Up Fee to those Noteholders that executed the Lock-Up Agreement), Noteholders located in the United States are not subject to undue inconvenience or prejudice, and the distribution of consideration under the Scheme is substantially similar to what might occur under U.S. law. *See Atlas Shipping*, 404 B.R. at 740. The Restructuring contemplated by the Scheme is similar to a consensual, pre-packaged chapter 11 plan. Notably, however, approval of the Scheme by a majority in number of the voting Noteholders representing at least three-quarters in amount of the Existing Notes voted represents a higher threshold than would otherwise be required in the context of a chapter 11 plan or reorganization. Further, the Relief Requested "would assist in the efficient administration of this cross-border insolvency proceeding, and it would not harm the interests of the debtors or their creditors." *In re Grant Forest Prods., Inc.*, 440 B.R. 616, 621 (Bankr. D. Del. 2010).

124.    A court may also deny a request for any chapter 15 relief that would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The legislative history indicates that the "public policy" exception is narrow, applying only to the

"most fundamental policies of the United States." H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 109 (2005); *see also Fairfield Sentry*, 714 F.3d at 138 ("The statutory wording requires a narrow reading."); *Vitro*, 701 F.3d at 1069; *Oilsands Quest*, 484 B.R. at 597. One court has determined, for example, that the lack of an opportunity for a jury trial is not manifestly contrary to U.S. public policy. *See In re Ephedra Prod. Liab. Litis.,* 349 B.R. 333, 335-36 (S.D.N.Y. 2006).

125.    Accordingly, it is not necessary that the result achieved in the UK Proceeding be identical to that which would be had in the United States. It is sufficient if the result is "comparable" or "similar." *Vitro*, 701 F.3d at 1044 (citing cases); *Sino-Forest*, 501 B.R. at 665 (quoting *Metcalfe*); *Metcalfe*, 421 B.R. at 697. Furthermore, the mere fact that a foreign representative requests relief that would be available under the law of the foreign proceeding, but not in the United States, is not alone grounds for denying comity. *See In re Condor Ltd.*, 601 F.3d 319, 327 (5th Cir. 2010).

126.    As noted above, most of the Requested Relief is substantially similar to the type of relief that would be available pursuant to a reorganization plan confirmed in a chapter 11 case. Here, the Restructuring does not contemplate a deleveraging of the Debtor, but rather changes the terms of the Existing Notes to provide the Debtor with more time to satisfy its obligations. The proposed changes to the terms of the Existing Notes only affect the consenting class of Noteholders, who are protected by the higher threshold for class acceptance of the Scheme compared to the threshold that applies to class acceptance for a chapter 11 plan under section 1126(c), as discussed above.

127.    To the extent that certain of the Releases apply to third parties, similar releases have been granted in plenary chapter 11 cases by courts in this Circuit where "the injunction

plays an important part in the debtor's reorganization plan[.]" *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992); *see also Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005) (outlining the circumstances justifying the implementation of third party releases, including where such releases are "an important part of the debtor's reorganization"); *Sino-Forest*, 501 B.R. at 663 (explaining that a bankruptcy court has jurisdiction to approve third party releases in plenary cases where the third-party claims may affect the *res* of the estate) (citing *In re Johns-Manville Corp.*, 600 F.3d 135, 153 & n.13 (2d Cir. 2010)).

128.    Courts in England are similarly sensitive to third-party releases contained in schemes of arrangement, and case law and practice has developed there to deal with them. *See* Houghton Declaration at ¶ 22-23. In this case, strong grounds exist under English law to sanction the Scheme, including the Releases. Most importantly, the Scheme cannot function without the Releases. If Noteholders could press their Existing Notes claims that are discharged under the Scheme against the Guarantors and/or the Sureties, which include certain of the Group's operating companies, then nothing will have been achieved, for the Guarantors and/or Sureties would have reimbursement and/or subrogation claims against the Debtor. Furthermore, as Noteholders would have recourse against various Group companies incorporated in different jurisdictions, and given the absence of effective cooperation among such various jurisdictions, it is possible, and indeed likely, that creditor enforcement would lead certain Group companies into liquidation, thereby eliminating the going-concern value the Scheme seeks to preserve for all of the Group's stakeholders. The Releases accordingly represent a fundamental part of a pragmatic, balanced, and extensively negotiated restructuring solution that maximizes enterprise value

54

without undue prejudice to the rights of creditors.  The Petitioner expects that the English Court will therefore sanction the Scheme, including the Releases, as fair and reasonable before this Court holds a hearing in respect of the Requested Relief.  *Id.*

129.    It is now well-established that a company through an English scheme of arrangement may cause the release of its creditors' claims under guarantees or sureties provided by third parties where the guarantees or sureties are of the debt being compromised under the scheme.  In accordance with the applicable case law, the English Court will consider the release only of claims which:

> (a)    are closely connected with the scheme creditors' rights as creditors against the scheme company;
>
> (b)    are personal and not proprietary rights;
>
> (c)    if exercised and leading to a payment by the third-party guarantor, would result in a reduction of the scheme creditors' claims against the company; and
>
> (d)    are "essential and ancillary" to the scheme.

Houghton Declaration at ¶ 24.

130.    These stringent tests ensure that any third-party releases through a scheme are appropriately circumscribed, unlikely to be abused, and within the jurisdiction of the English Court.   In this case, these tests are met.  With respect to the Releases as they relate to the Guarantors and the Sureties, such Releases are essential, because without them any amounts the Guarantors or the Sureties paid on the debt to the holders of Existing Notes would merely be transformed into contribution or subrogation claims of each Guarantor or Surety, as applicable, against the Debtor and/or the other Guarantor or Surety.  For the same reason, the "close connection" and "reduction in claims against the company" requirements are met.  The Releases are essential and ancillary to the compromise embodied in the Scheme, because the guarantees

EU-DOCS\16262225.13

and sureties cover the same debt as will be adjusted under the Scheme.  The released rights are for satisfaction of a debt and are thus personal rather than proprietary in nature—any release of a proprietary security right being the direct result of a release of such debt.  Without the Releases, demands for payment would mean that the Guarantors and Sureties would have to undergo uncertain and expensive restructuring alternatives or liquidate, risks and expenses that the vast majority of holders of Existing Notes are unwilling to endure.  In the present circumstances, a requisite "give and take" between Guarantors and Sureties, on the one hand, and holders of Existing Notes, on the other, will be present to allow for a release of third-party guarantee and surety claims given that they relate to such holders' claims against the Debtor, and the overall Scheme inures to the benefit of both the holders of Existing Notes, on the one hand, and the Guarantors and the Sureties, on the other hand, as the financial position of the Debtor and its affiliates will be improved and value preserved in comparison to the alternatives.  Furthermore, the Guarantors and Sureties will guarantee the New Notes (issued pursuant to the Restructuring).

131.    Absent the implementation of the Releases, the Restructuring—which, as noted throughout this Petition, are value accretive to the Debtor's and the Group's various stakeholders—could be effectively undermined if dissident creditors could side-step the Scheme by commencing litigation against the Released Parties.  As such, the Releases play an important part of the Debtor's reorganization.  *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *c.f. In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141.  Moreover, absent entry of the Releases, the directors, members, officers, and representatives of the Debtor, the members of the Steering Committee, and each of their respective advisors, and other actors would not be willing take the actions necessary to consummate the Scheme.  The release of corporate agents, such as directors, and professionals such as those proposed in the Scheme are

EU-DOCS\16262225.13

not uncommon in plenary chapter 11 cases and have been approved in cases where (like here) claims asserted against such parties would result in an indirect claim against a debtor's estate or otherwise stall or imperil the reorganization of the debtor.  *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d at 293 (finding that injunction limiting the suits brought against directors was essential because if such directors feared additional suits, they would be disinclined to settle, thus holding up the reorganization of the debtor); *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 701 (4th Cir. 1989) (noting that the release of professionals was important to the successful reorganization of the debtor because causes of action against them would give rise to indemnity or contribution claims against the debtor).  Likewise, releases of claims against these types of persons have been approved in chapter 15 cases before this Court.  *See, e.g., In re Zlomrex International Finance S.A.*, No. 13-14138 (Bankr. S.D.N.Y. Jan. 31, 2014); *In re Magyar Telecom B.V.*, No 13-13508 (Bankr. S.D.N.Y. Dec. 11, 2013).  Accordingly, the Releases should be given full force and effect in the United States.

132.    There is precedent for a court in a chapter 15 case to approve injunctive relief to enforce a foreign insolvency plan that includes nonconsensual, third-party releases, such as the Releases.  In *In re Metcalfe & Mansfield Alternative Investments*, for instance, Judge Glenn granted recognition of a Canadian proceeding and entered an order enforcing a Canadian scheme that included "a very broad third party release."  421 B.R. at 687-88; *see also In re New World Resources N.V.*, Case No. 14-12226 (SMB) (Bankr. S.D.N.Y. 2014) (granting injunction to enforce releases in scheme because all of the injunctions were "essential to the success of the Scheme" and conferred material benefits on the debtor and its creditors).

133.    The *Metcalfe* court was uncertain as to whether the releases, which were designed to primarily benefit counterparties to the debtor under certain swaps, allowed in Canada would

have been allowed as part of a plan of reorganization in a chapter 11 case in the United States.

*Id.* at 692, 694-95.    The court observed, however, that the correct inquiry is not whether the

scheme could have been approved in a chapter 11 case, but rather "whether the foreign orders

should be enforced in the United States."    *Id.* at 696; *see also Sino-Forest*, 501 B.R. at 662

(citing *Metcalfe*); *Oui Financing*, 2013 WL 5568732, at *7 (applying New York comity doctrine,

the Court dismissed action seeking to enforce non-debtor guarantor's New York law obligations

because granting judgment would interfere with the implementation of the restructuring plan).

134.    In analyzing whether granting the requested relief would be manifestly contrary to

the public policy of the United States, the court in *Metcalfe* noted that relief requested in support

of a foreign proceeding need not be identical to relief available in a plenary case in the United

States and that the "public policy" exception is to be narrowly construed to include only the most

fundamental policies of the United States within its scope.    *Id.* at 697.    The court understood that

the "key determination" it was required to make was "whether the procedures used in Canada

[met American] fundamental standards of fairness."    *Id.* (citing *Cunard S.S. Co. v. Salen Reefer

Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985)); *see also Sino-Forest*, 501 B.R. at 662 (citing

*Metcalfe*); *Oilsands Quest*, 484 B.R. at 597 ("[A] a foreign judgment should generally be

accorded comity if its proceedings are 'fair and impartial.'").    Without setting out in detail the

applicable standards for approval of third party releases in plenary chapter 11 cases, the court

stated that applicable Second Circuit precedent and the decision of the Ontario Court of Appeals

"both reflect similar sensitivity to the circumstances justifying approving such provisions."

*Metcalfe*, 421 B.R. at 697-98; *cf Vitro*, 701 F.3d at 1068 (observing that such sensitivity was

absent from the process of approval of a Mexican restructuring plan that included releases of

non-debtor liability and that was accepted only by counting the insider votes of the very parties

58

to be released within the same class as other creditors (and where the requisite level of acceptance would not have been reached without the insider votes) and affirming denial of relief in aid of enforcement of such plan); *Telecom Argentina*, 528 F.3d at 173 (stating that comity "does not require that foreign proceedings afford a creditor identical protections as under U.S. bankruptcy law" and holding that the absence of a "best interests" test does not prevent recognizing of ancillary foreign proceedings under former section 304(c) of the Bankruptcy Code); *see also Sino-Forest*, 501 B.R. at 665 (citing high level of support for plan that does not rely on the support of insiders and a similar sensitivity to the circumstances justifying approving such provisions as those considered by U.S. courts); *Hopewell*, 238 B.R. at 56-61 (barring objections not raised before the foreign insolvency court and stating that "[a]s long as the manner in which the scheme acquired statutory effect comports with our notions of procedural fairness, comity should be extended to it") (citations omitted); *In re Gee*, 53 B.R. 891, 902, 904 (Bankr. S.D.N.Y. 1985) (stating that "[f]or comity to be extended, it is necessary only that the foreign court abide by fundamental standards of procedural fairness" and noting that the ancillary court, if satisfied with the procedural fairness of the foreign proceeding, "should not sit as an appellate court over the foreign proceedings").

135.    The *Metcalfe* court therefore examined the Canadian scheme using the traditional standards American courts employ to analyze whether ordinary foreign judgments should be recognized and enforced, *i.e.*, whether the forum provides "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other

countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting." *Metcalfe*, 421 B.R. at 698 (internal citations omitted).

136.    In this case, the Scheme proceeding readily meets these standards.  As described above, the English Court's exercise of jurisdiction over the Debtor and its Scheme was proper pursuant to the Part 26 of the Companies Act 2006.

137.    DTEK's connections to the United Kingdom described above and cited as indicators DTEK maintains its COMI in England also lead to the conclusion under United States and international norms that the English Court's exercise of jurisdiction to adjudicate was proper. *See Restatement of the Law (Third), Foreign Relations Law of the United States* § 421 (1987) (setting forth "reasonableness" standard for exercise of jurisdiction to adjudicate and citing, *inter alia*, presence, regular conduct of business, and consent to jurisdiction as indicators of reasonable exercise of such jurisdiction by a particular country's courts over a company).

138.    Regarding procedural fairness, the Petitioner submits that the steps undertaken and to be undertaken before the Scheme and the New Notes Documents can become effective ensure due process such that this Court should grant comity to the Scheme Sanction Order (if issued and duly lodged with the Registrar of Companies) and to recognize and enforce the Scheme and the New Notes Documents if they become effective.  This Court should take comfort in the fact that the Scheme will have been approved by an English court under the laws of England and Wales.  *See Hopewell*, 238 B.R. at 66 ("[W]hen the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings.") (internal quotation marks and citations omitted); *see also Sino-Forest*, 501 B.R. at 663 (citing *Metcalfe* for a similar proposition).

60

139.    Second, the specific steps followed and to be followed in the UK Proceeding demonstrate adequate process.  Notice of the application to convene creditors' meetings (*i.e.*, the Scheme Meeting) and the hearing thereon was delivered to all Noteholders pursuant to the Practice Statement Letter on November 18, 2016, by (i) postings on the Scheme Website and (ii) delivery to Noteholders through the Clearing Systems.  The formal notice period is reasonable.  The English Court has ordered that the Information Package (i) be published on the Scheme Website and that notice be given to the Noteholders via the Clearing Systems and (ii) be made available for inspection during normal business hours at the offices of Latham & Watkins LLP, 99 Bishopsgate, London EC2M 3XF, UK.  The Information Package should include, among other things, (a) the Explanatory Statement, (b) the Scheme, (c) the Notice of the Scheme Meeting, and (d) voting instructions.  Notification that the Information Package is available has been published on the Information Agent's website.

140.    In addition to having been able to participate at the hearing considering whether to enter the Convening Court Order and in negotiations in respect of the Scheme up to this point, each of the Noteholders had the opportunity to attend the Scheme Meeting, ask questions, and raise concerns in respect of the Scheme, and ultimately to vote against it in person or by proxy if it believed the Scheme to be outside the best interests of Noteholders, the only creditors whose rights are impaired by the Scheme.

141.    As noted above, in order for the Scheme to become binding, it must also be approved by the English Court following the Scheme Meeting (assuming the requisite majority votes in favor have been obtained) at the Sanction Hearing.  All Noteholders will have another opportunity to raise objections to the Scheme and to submit and examine evidence at the Sanction Hearing.  Additional safeguards of due process include:

EU-DOCS\16262225.13

- If the English Court approves the Scheme, the Scheme Sanction Order will be appealable by Noteholders, subject to permission granted by the English Court or, as the case may be, the Court of Appeal itself.

- United States and other non-English creditors have the same rights to participate in the UK Proceeding as English creditors.

- The procedures followed and to be followed regarding notice, information, voting, and opportunity to object and present evidence in the UK Proceeding are similar to those employed in chapter 11 cases in the United States.

142.   In addition to the matters set forth above, the Scheme itself has the following features that ensure the fairness of the Scheme:

(a)   acceptance of the Scheme requires seventy-five percent in value and a majority in number of the Noteholders that cast a vote; and

(b)   all Noteholders are receiving the same treatment (provided, however, that certain Noteholders may receive the Lock-Up Fee).

Houghton Declaration at ¶ 20.

143.   Accordingly, the Petitioner submits that the standards required to "sufficiently protect" creditors and other parties in interest have been met, that grant of the Requested Relief would not be manifestly contrary to the public policy of the United States, and that the Requested Relief can and should therefore be granted.

**(iv)   Granting the Discretionary Relief Requested Meets the Traditional Standards of "Comity" Under Section 1507(b)**

144.   While satisfaction of the standards set forth in sections 1521 and 1522 are sufficient to grant the discretionary portions of Relief Requested, to the extent the Court holds that section 1507(a) is a necessary predicate to granting such relief, the Petitioner submits that granting the Relief Requested meets the standards of comity set forth under section 1507(b) of the Bankruptcy Code.

145.   The first factor under section 1507(b) is whether the additional assistance contemplated will reasonably assure "just treatment of all holders of claims against or interests in

the debtor's property."  As noted above, the claims subject to the Scheme consist of beneficial interests under two debt instruments, the Indentures.  The Scheme provides for Noteholders to receive New Notes on a *pro rata* basis.  The Debtor's other creditors' claims are not impaired by the Scheme.  Just treatment of the Noteholders is protected, in part, by the higher voting threshold to approve the Scheme, versus a plan of reorganization in the chapter 11 context.

146.    The second enumerated factor, "protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding," 11 U.S.C. § 1507(b)(2), is satisfied where creditors are given adequate notice of timing and procedures for filing claims, and such procedure does not create any additional burdens for a foreign creditor to file a claim.  *See, e.g., Treco*, 240 F.3d at 158; *In re Petition of Hourani*, 180 B.R. 58, 68 (Bankr. S.D.N.Y. 1995).    Given the fact that the Debtor does not have a comprehensive schedule of the identities of the Noteholders, it has taken measures reasonably calculated to effect adequate notice by delivering notice of the Scheme, the Scheme Meeting, and other relevant documents and deadlines, to the relevant depositaries through the Information Agent for distribution to Account Holders and on to the Noteholders through the Clearing Systems.  Only the Existing Notes are being affected by the Scheme, and as such, there is no requirement that any Noteholder file a claim in the Scheme to protect their interest.  In addition, the Debtor has publicized the proceedings through the Scheme Website.  All Noteholders are treated equally.

147.    Section 1507(b)(3) requires that the "additional assistance" being considered will reasonably assure prevention of preferential or fraudulent dispositions of property of the Debtor.  This consideration has little relevance here as DTEK is merely a finance company whose primary activities are receiving payments on the Intercompany Loans and making payments on

the Existing Notes; absent from this situation are myriad trade and other creditors which in other circumstances could give rise to preference or fraudulent transfer concerns.  Furthermore, such trade and other creditors are not affected by the Scheme and retain their rights.

148.    Section 1507(b)(4) requires that the distribution of the Debtor's property substantially comply with the order of distribution available under the Bankruptcy Code.  *See, e.g., In re Gee*, 53 B.R. at 904; *see also Haarhuis v. Kunnan Enters., Ltd.*, 177 F.3d 1007 (D.C. Cir. 1999) (finding that the Taiwanese distribution system was substantially in accordance with U.S. law because priority afforded to certain classes of claims as under the Bankruptcy Code). Simply put, section 1507(b)(4) merely requires that the "foreign distribution scheme be 'substantially in accordance' with United States bankruptcy law; it does not have to mirror the United States distribution rules."  *In re Ionica*, 241 B.R. 829, 836 (Bankr. S.D.N.Y. 1999) (citations omitted).  Priority both in right of payment and in distribution of proceeds in the Debtor's property is respected in substantially the same way it is respected under the Bankruptcy Code as all Noteholders are being treated equally and must consent as a class for the Scheme to proceed.

149.    Section 1507 of the Bankruptcy Code requires that any determination of a request for assistance under chapter 15 be "consistent with principles of comity[.]"  11 U.S.C. § 1507. As the House Judiciary Committee noted in its report, "comity is raised to the introductory language to make clear that it is the central concept to be addressed."  H. Rep. at 109, U.S. Code Cong. & Admin. News 2005, 88, 172; *see also* 11 U.S.C. § 1509(b)(3) (once recognition of a foreign proceeding is granted, the court in the United States shall grant comity or cooperation to the foreign representative).

150.    Principles of comity support the grant of the relief requested herein.  Federal courts generally extend comity "whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy."  *See Victrix*, 825 F.2d at 713 (citing *Hilton v. Guyot*, 159 U.S. 113, 202-03, 16 S. Ct. 139, 40 L. Ed. 95 (1895)); *see also Cunard*, 773 F.2d at 456-57; *Atlas Shipping*, 404 B.R. at 733. As noted above, particularly in the bankruptcy context, "American courts have long recognized the need to extend comity to foreign bankruptcy proceedings," because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *Victrix*, 825 F.2d at 713-14.  Other courts have similarly underscored the importance of extending comity to foreign bankruptcy proceedings.  *See, e.g., Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d. Cir. 1999); *Maxwell Commc'ns Corp. v. Societe Generate (In re Maxwell Commc'ns Corp.)*, 93 F.3d 1036, 1048 (2d Cir. 1996); *Cunard*, 773 F.2d at 458; *Oui Fin.*, 2013 WL 5568732, at *5 (comity under New York law should normally be extended to foreign restructuring proceedings if the foreign court is of competent jurisdiction, and the proceedings are procedurally fair and do not contravene public policy).  Indeed, comity should be withheld only when the recognition of foreign proceedings would be adverse to the public policy interests of the United States.  *See Somportex, Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3rd Cir. 1971); *Cunard*, 773 F.2d at 457 (citing *Somportex*).  As discussed above, because the Scheme is not contrary or prejudicial to the interests of creditors in the United States, the doctrine of comity supports the granting of permanent relief enforcing the Scheme under both section 1507 and section 1521 of the Bankruptcy Code in this case.

151.    Accordingly, the Requested Relief should be granted.

## NOTICE

152.    Notice of this Petition has been provided to (i) the Debtor, (ii) counsel to the Debtor, (iii) counsel to GLAS Trust Corporation Limited, as trustee of the Existing Notes, (iv) counsel to the Security Agent (as defined in the Lock-Up Agreement), (v) counsel to the Steering Committee, (vi) the Information Agent, (vii) counsel to the coordinating committee of Bank Lenders, (viii) lenders under the Essential Credit Lines, (xi) the Office of the United States Trustee for the Southern District of New York, and (x) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Petitioner is aware.  Furthermore, notice of the intention to commence this case was given to the Noteholders in the Practice Statement Letter, which was disseminated in the manner described above.  The Petitioner submits that no other or further notice need be provided.

## NO PRIOR REQUEST

153.    No previous request for the relief requested herein has been made to this or any other court.

EU-DOCS\16262225.13

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that this Court enter an order (i) granting the Relief Requested herein and (ii) granting the Petitioner and Debtor such other and further relief as the Court deems proper and just.

67

Dated: New York, New York
December 16 , 2016

LATHAM & WATKINS LLP

Adam J. Goldberg
Marc A. Zelina
885 Third Avenue
New York, NY 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

Adam E. Malatesta (admission *pro hac vice*, pending)
355 South Grand Avenue
Los Angeles, CA 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

Attorneys for Johan Bastin as Petitioner and Foreign Representative

**VERIFICATION**

JOHAN BASTIN hereby declares:

1.    I have been appointed Foreign Representative by the board of directors of DTEK Finance plc and have been declared by the Chancery Division (Companies Court) of the High Court of Justice of England and Wales as authorized to commence and act in this ancillary case.

2.    I have read this Verification and the foregoing Petition and I am informed and believe that the factual allegations contained therein are true and correct.

3.    I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:    _____
            December 16, 2016

/s/ _____
DR. JOHAN BASTIN

**Exhibit A**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| DTEK Finance plc, | ) | Case No. _____ (___) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |
| | ) | |

## ORDER GRANTING PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND MOTION FOR RELATED RELIEF [DOCKET NOS. 1 AND 2]

Upon consideration of the *Verified Petition for Recognition of Foreign Main Proceeding, Supplementing "Voluntary Petition" [Docket No. 1], and Motion for Related Relief Pursuant to Section 105(a), 1507(a), 1509(b)(2)-(3), 1521(a), and 1525(a) of the Bankruptcy Code Giving Full Force and Effect to UK Scheme of Arrangement* [Docket No. 2] (together with the Form of Voluntary Petition [Docket No. 1], the "Petition"),[1] the Bastin Declaration, and the Houghton Declaration (together with the Petition and the Bastin Declaration, the "Chapter 15 Pleadings"), each filed on December 16, 2016 by or on behalf of the Petitioner, Johan Bastin, in his capacity as the duly-appointed foreign representative of DTEK Finance plc ("DTEK" or the "Debtor"), the debtor in a voluntary Scheme of Arrangement (the "UK Proceeding") concerning the Debtor currently pending before the Chancery Division (Companies Court) of the High Court of Justice of England and Wales (the "English Court"); and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference, dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. § 1410; and the Court having considered and

---

[1]     Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Petition.

EU-DOCS\16262225.13

reviewed the Chapter 15 Pleadings and having held a hearing to consider the relief requested in the Petition on _____, 2017 (the "Hearing"); and it appearing that timely notice of the filing of the Chapter 15 Pleadings and the Hearing has been given to the Debtor, counsel to the Debtor, counsel to GLAS Trust Corporation Limited, as trustee of the Existing Notes, counsel to the Security Agent (as defined in the Lock-Up Agreement), counsel to the Steering Committee, the Information Agent, counsel to the coordinating committee of Bank Lenders, lenders under the Essential Credit Lines, the Office of the United States Trustee for the Southern District of New York, and all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Petitioner is aware and that no other or further notice need be provided; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND**, that:

1.      This case was properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference, dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

4.      This Court may enter a final order consistent with Article III of the United States Constitution.

EU-DOCS\16262225.13

5.      The funds held in the Bank Account are property of the Debtor within this district; the Debtor is therefore "eligible" pursuant to 11 U.S.C. § 109(a), and venue is proper in this district pursuant to 28 U.S.C. § 1410(1).

6.      The UK Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

7.      The UK Proceeding is pending in England (a constituent member of the political union comprising the United Kingdom), which is the country in which the Debtor has the center of its main interests, and, as such, the UK Proceeding is a "foreign main proceeding" within the meaning of sections 1502(4) and 1517(b)(1) of the Bankruptcy Code and entitled to recognition as the foreign main proceeding in respect of the Debtor.

8.      The Petitioner, Johan Bastin, has been duly appointed by the Debtor and has been declared by the English Court as authorized to act as the "foreign representative" with respect to the UK Proceeding within the meaning of section 101(24) of the Bankruptcy Code.

9.      The Petition meets all of the requirements set forth in section 1515 of the Bankruptcy Code.

10.     The UK Proceeding is entitled to recognition by the Court as a foreign main proceeding pursuant to sections 1517(a) and 1517(b) of the Bankruptcy Code.

11.     The Debtor and the Petitioner are entitled to all of the relief set forth in section 1520 of the Bankruptcy Code.

12.     Appropriate notice of the filing of, and the hearing on, the Petition was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

13.     The relief granted hereby is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States,

EU-DOCS\16262225.13

warranted pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1520, 1521(a), and 1525 of the Bankruptcy Code, and will not cause hardship to creditors of the Debtor or other parties in interests that is not outweighed by the benefits of granting that relief.

14.     The relief granted hereby is necessary to effectuate the purposes and objectives of chapter 15 and to protect the Debtor and the interests of its creditors and other parties in interest.

15.     Absent the relief granted hereby, the Debtor and the Released Parties may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative, or regulatory actions or proceedings in connection with the Scheme claims against the Debtor and the Released Parties or their property, thereby interfering with and causing harm to, the Debtor, its creditors, and other parties in interest in the UK Proceeding and, as a result, the Debtor, its creditors, and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

16.     Absent the requested relief, the efforts of the Debtor, the English Court, and the Petitioner in conducting the UK Proceeding and effecting the Restructuring under the Scheme, the New Notes Documents, and English law may be thwarted by the actions of certain creditors, a result inimical to the purposes of chapter 15 as reflected in section 1501(a) of the Bankruptcy Code.

17.     Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is essential to the success of the Scheme, (iii) is an integral element of the Scheme and/or to its effectuation, (iv) confers material benefits on, and is in the best interests of, the Debtor and its creditors, including without limitation the Noteholders, and (v) is important to the overall objectives of the Restructuring.  For all of the foregoing reasons and after due deliberation and sufficient cause appearing therefor, it is hereby

EU-DOCS\16262225.13

**ORDERED, ADJUDGED, AND DECREED**, that:

(A)    the Petition and the Relief Requested are granted, and any objections thereto are overruled with prejudice;

(B)    the UK Proceeding is granted recognition as a foreign main proceeding (as defined in section 1502 of the Bankruptcy Code) pursuant to sections 1517(a) and (b)(1) of the Bankruptcy Code;

(C)    the Petitioner is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the UK Proceeding;

(D)    the Debtor and the Petitioner are granted all of the relief set forth in section 1520 of the Bankruptcy Code including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and to the Debtor's property that is within the territorial jurisdiction of the United States;

(E)    the Petitioner is hereby (i) authorized to examine witnesses, take evidence, and deliver information concerning the Debtor and its business and (ii) entrusted with the administration of any and all of the Debtor's assets within the territorial jurisdiction of the United States;

(F)    the Scheme Sanction Order and the Scheme are recognized, granted comity, and entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and such terms shall be binding and fully enforceable on, in the event of the Restructuring, all Noteholders and Related Parties, whether or not they actually agreed to be bound by the Scheme or participated in the UK Proceeding;

(G)    as of the Scheme Settlement Date, the New Notes Documents are entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy

EU-DOCS\16262225.13

Code) in accordance with their terms, and such terms shall be binding and fully enforceable on, in the event of the Restructuring, all Noteholders and Related Parties, whether or not they actually agreed to be bound by the Scheme or participated in the UK Proceeding;

(H)     subject to paragraph (P) below, as of the Scheme Settlement Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the personal liability of the Debtor or any Released Party with respect to any debt cancelled, discharged, or restructured under the Scheme (including, for the avoidance of doubt, any amount owed in connection with the Existing Notes) and/or as a result of English law relating to the Restructuring, is unenforceable within the territorial jurisdiction of the United States;

(I)     subject to paragraph (P) below, as of the Scheme Settlement Date, all Noteholders and Related Parties are permanently enjoined from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit, or other proceeding (including, without limitation, arbitration, mediation, or any judicial, quasi-judicial, or administrative action, proceeding, or process whatever in any judicial, arbitral, administrative, or other forum), employing any process, or performing any act within the territorial jurisdiction of the United States to collect, recover, or offset (except as expressly provided in the Scheme or the New Notes Documents) any debt or claim cancelled, discharged, or restructured under the Scheme (including, for the avoidance of doubt, any amount owed in connection with the Existing Notes) and/or as a result of English law relating to the Restructuring, or seeking discovery related thereto;

(J)     subject to paragraph (P) below, as of the Scheme Settlement Date, all Noteholders and Related Parties are permanently enjoined from commencing or continuing any action (including, without limitation, arbitration, mediation, or any judicial, quasi-judicial, or

EU-DOCS\16262225.13

administrative action or proceeding or process whatever in any judicial, arbitral, administrative, or other forum), including by way of counterclaim, employing any process, or performing any act, to collect, recover, or offset (except as expressly provided in the Scheme and the New Notes Documents) any debt cancelled, discharged, or restructured under the Scheme (including, for the avoidance of doubt, any amount owed in connection with the Existing Notes) and/or as a result of English law relating to the Restructuring, against property of the Debtor or of the Released Parties within the territorial jurisdiction of the United States, including (i) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judicial, quasi-judicial, or administrative judgment, award, determination, decree, assessment, garnishment, order, or arbitration award against the Debtor or the Released Parties or their respective property, or any direct or indirect transferee of or successor to any property of the Debtor or of the Released Parties, or any property of such transferee or successor, or (ii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien or encumbrance of any kind against such property;

(K)    as of the Scheme Settlement Date, all Noteholders and Related Parties are permanently enjoined from (i) transferring, relinquishing, or disposing of any property of the Debtor or of the Released Parties located within the territorial jurisdiction of the United States, or (ii) taking or continuing any act to obtain possession of, commingle, or exercise control over such property within the territorial jurisdiction of the United States, to the extent any such act under (i) or (ii) is inconsistent with the Scheme, the New Notes Documents, and English law relating to the Restructuring;

(L)    as of the Scheme Settlement Date, all entities (as that term is defined in section 101(15) of the Bankruptcy Code) subject to the Court's jurisdiction are permanently enjoined

7

from taking any action inconsistent with the Scheme, including, without limitation, against the

Debtor, the Released Parties, or against any property of the Debtor or the Released Parties within

the territorial jurisdiction of the United States;

(M)     as of the Scheme Settlement Date, all entities (as that term is defined in section

101(15)) are permanently enjoined from commencing or continuing in any manner any suit,

action, or other proceeding in the territorial jurisdiction of the United States to settle any dispute

that arises out of any provision of the Scheme and English law relating to the Restructuring;

(N)     as of the Scheme Settlement Date, all Noteholders and Related Parties are

permanently enjoined within the territorial jurisdiction of the United States from commencing or

continuing in any manner, directly or indirectly, including by way of counterclaim, any action,

suit, or other proceeding (including, without limitation, arbitration, mediation, or any judicial,

quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral,

administrative, or other forum), or employing any process, against the Foreign Representative

(personally or in such capacity), the Debtor, the Released Parties, or any of their respective

successors, assigns, agents, representatives, advisors, or attorneys (collectively, the "Debtor

Parties") or any of them in respect of any claim or cause of action, in law or in equity, arising out

of or relating to any action taken or omitted to be taken by any of the Debtor Parties or in

preparing, disseminating, applying for, or implementing the Scheme or the Scheme Sanction

Order;

(O)     no action taken by the Petitioner in preparing, disseminating, applying for,

implementing, or otherwise acting in furtherance of the Scheme, the New Notes Documents, this

Order, the Chapter 15 Case, any further order for additional relief in this Chapter 15 Case, or any

adversary proceedings or contested matters in connection therewith, will be deemed to constitute

8

a waiver of any protection afforded the Petitioner, as Foreign Representative, including, without limitation, pursuant to section 1510 of the Bankruptcy Code;

(P)    for the avoidance of doubt, nothing in this Order shall impair the rights of any entity granted under the Scheme or the New Notes Documents, having regard in particular to the exclusive right of the Courts of England & Wales to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the Explanatory Statement or any provision of the Scheme, or out of any action taken or omitted to be taken under the Scheme or in connection with the administration of the Scheme;

(Q)    the Court shall retain jurisdiction with respect to the effect, enforcement, amendment, or modification of this Order, any request for additional relief and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of the Court; and

(R)    this Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

Dated:  New York, New York
        _____

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

EU-DOCS\16262225.13